SUSIE L. KNIGHT, administratrix, *vs.* OVERMAN WHEEL
COMPANY.

Hampden.    September 26, 1899. — October 21, 1899.

Present: HOLMES, C. J., KNOWLTON, LATHROP, HAMMOND, & LORING, JJ.

*Loss of Life — Master and Servant — Employers' Liability Act — Superintend-
ent — Negligence — Assumption of 'Risk — Due Care — Law and Fact —
Conscious Suffering — Exceptions — Instructions — Evidence.*

In an action under the employers' liability act, St. 1887, c. 270, for the death of
the plaintiff's intestate resulting from injuries occasioned, while he was engaged
with others in taking down a piece of shafting in the defendant's mill, by the
fall of the shafting upon him, it appeared that A. was the defendant's general
superintendent; and that B. was under him, and had entire charge of the men
doing the work in question.  There was evidence from which the jury would
have been warranted in finding that the accident was due to leaving the belt on
the driving pulley, thus causing a side strain, and that this was not a proper
way of doing the work.  There was also evidence of negligence on B.'s part in
other particulars relating to this work.  There was testimony for the defendant,
which, if believed, would have warranted the jury in finding that B. worked
most of the time with his hands, while there was evidence for the plaintiff that
he worked very little with his hands, and was principally employed in directing
the men.  *Held,* that, upon the evidence, it was a question for the jury whether
B. was a superintendent, and whether he was negligent.

Evidence that a person in the employ of a corporation was intrusted by its general
superintendent with the duty of superintending the work of lowering a piece of
shafting in the mill of the corporation, and that the superintendent took no
charge of the work and was not present, brings such person within the purview
of St. 1894, c. 499, amending the employers' liability act, St. 1887, c. 270.

It cannot be said that the falling of a piece of shafting in a mill, which a workman
is engaged with others, under the direction of a foreman, in lowering, is one of
the ordinary risks of his employment which he voluntarily assumes.

At the trial of an action for the death of the plaintiff's intestate resulting from in-
juries caused by the fall upon him of a piece of shafting, which he with others
was engaged in lowering, the defendant contended that the accident was caused
by the slipping of the cat's-paw hitch, which was a part of the mechanism used,
and which was made by a fellow servant of the intestate; and that, after this
hitch was made, a half hitch should have been made with the end of the chain,
thus rendering the cat's-paw hitch less likely to slip.  *Held,* that a request for
a ruling, that "there is no sufficient evidence that the death of, and injury to,
the plaintiff's intestate was not caused by the negligence of a mere fellow ser-
vant," was rightly refused, there being evidence from which the jury might
have found that the side strain on the shafting caused by the belt being left on
the pulley through the negligence of the defendant's superintendent was the
cause of the accident.

Upon the evidence in this case, which was an action for the death of the plaintiff's intestate resulting from injuries occasioned, while he was engaged with others in taking down a piece of shafting in the defendant's mill, by the fall of the shafting upon him, the question of due care on the part of the intestate was for the jury.

In an action under the employers' liability act, St. 1887, c. 270, as amended by St. 1892, c. 260, for the death of the plaintiff's intestate resulting from injuries caused by the fall of a piece of shafting upon him, and for conscious suffering consequent upon such injuries, one witness testified that the intestate said, "Oh! I am gone." Another witness testified that he said, after the injury, "Boss, it is n't any use, I am done for." A third witness testified: "I heard" him "holler once or twice; I heard him groan three or four times, and his eyes were open. I helped remove the shaft from him; then three of us carried him down to the front door; when we got him down to the front door he was dead." *Held*, that, upon this evidence, it was a question for the jury whether or not the death of the intestate was preceded by conscious suffering.

In an action under the employers' liability act, St. 1887, c. 270, for the death of the plaintiff's intestate resulting from injuries caused by the fall upon him of a piece of shafting, which he with others was engaged in lowering, and around which one end of a chain was attached, the other end being attached by a cat's-paw hitch to chain falls suspended from the ceiling of the room above, through the floor of which a hole had been cut, there was expert evidence that the cause of the falling of the shaft was due to the fact that the cat's-paw hitch was made without a single or a double half hitch being afterwards made; and there was evidence that after the hitch was made, the defendant's superintendent came to the floor where the falls and the hitch were and looked around. *Held*, that a request that "the plaintiff is not entitled to recover in this action because the cat's-paw hitch was an improper hitch under the circumstances, or because said hitch was improperly made," the defendant contending that the hitch was made by a fellow workman of the intestate, was rightly refused.

It cannot be said, as matter of law, in an action for the death of the plaintiff's intestate resulting from injuries caused by the fall upon him of a piece of shafting, what the proximate cause of the falling of the shafting was, or whether a workman failed to hitch the chain which sustained the weight of the shaft properly or not, but these are questions for the jury.

A request for a ruling based upon a fact of which there is no evidence is rightly refused.

No exception lies, in an action for the death of the plaintiff's intestate resulting from injuries caused by the fall upon him of a piece of shafting, which he with others was engaged in lowering, to the refusal to rule that "there is no sufficient evidence that the allowing of the belt to remain on the pulley caused or contributed to the accident, and there can be no recovery on that ground," there being evidence that the belt on the pulley caused or contributed to the accident.

At the trial of an action under the employers' liability act, St. 1887, c. 270, § 1, cl. 2, for the death of the plaintiff's intestate resulting from injuries caused by the fall upon him of a piece of shafting, which he with others was engaged in lowering, a request for a ruling that "the risk which resulted in injury or death of the plaintiff's intestate was a transitory risk of which the defendant was not required to notify said intestate, and the plaintiff cannot recover," is rightly refused.

A point not taken at the trial is not open on a bill of exceptions.

In an action for the death of the plaintiff's intestate resulting from injuries caused by the fall upon him of a piece of shafting, which he with others was engaged in lowering, a witness, who was one of the workmen, properly is allowed to testify whether the pulley or the belt upon the pulley situated as it was, and in the shape in which he saw it there, caused any strain upon this pulley which was being taken down, and in which direction the strain was.

If, in a long hypothetical question to a witness, one element is omitted, a specific objection on this ground should be made.

An adverse witness, who was called by the plaintiff, in an action for the death of his intestate resulting from personal injuries, made a statement in writing directly after the accident which contradicted his testimony on material points. On re-direct examination, the statement was shown to him, and he admitted his signature and that the questions appearing in the statement were put to him, and that the answers were made by him. An objection to this admission of the statement was a general one, the bill of exceptions alleged by the defendant not giving the questions and answers verbatim, but stating the matter in a narrative form. *Held*, that it sufficiently appeared that the witness was asked whether he made the statement, and was allowed to explain it.

Where a statement in writing made by an adverse witness directly after the accident upon which an action is founded, which contradicts his testimony on material points, is admitted in evidence, after being called to his attention, against the defendant's objection, if the effect of the judge's charge on this part of the case is that the statement is not to be treated as substantive evidence, but is to be used merely as affecting the testimony of the witness, if there is anything in it inconsistent with his testimony on the stand, the rights of the defendant are fully protected.

In an action for the death of the plaintiff's intestate resulting from injuries caused by the fall upon him of a piece of shafting, which he with others was engaged in lowering, if the defendant seeks to excuse an improperly made hitch, which was a part of the mechanism used, or want of supervision over it, by evidence that he allowed his workmen to make any sort of a hitch they saw fit, such evidence is incompetent, unless it is further shown that the plaintiff's intestate was aware of the practice.

TORT, to recover for the death of the plaintiff's intestate, Charles S. Knight, and for conscious suffering consequent upon injuries received while in the employ of the defendant. At the trial in the Superior Court, before *Maynard*, J., the case went to the jury upon the third and fourth counts of the declaration. The third count was under the St. of 1887, c. 270, § 1, cl. 2, as amended by the St. of 1892, c. 260, § 1, and was as follows: " And the plaintiff says that her intestate was in the employ of the defendant; that by reason of the negligence of some person in the service of the defendant intrusted with and exercising superintendence, whose sole or principal duty was that of superintendence, the plaintiff's intestate, while in said employ and in the discharge of his duties in said employ,

being at the time in the exercise of due care, was hurt and injured, and has suffered great pain of body and anguish of mind, and has since died as a result of said injury; that due notice of the time, place, and cause of said injury and death were given to the defendant; that said intestate left a widow, Susie L. Knight, and one minor child, —— Knight, both of whom were dependent upon the wages of said intestate for support."

The fourth count differs from the third only in alleging, under the St. of 1894, c. 499, that the injury and death were "by reason of the negligence of some person in the service of the defendant, who at the time was acting as superintendent, with the authority and consent of the defendant, in the absence of the defendant's superintendent," instead of alleging the negligence of the superintendent, as in the previous count.

The jury returned a verdict for the plaintiff in the sum of $3,250, and apportioned $2,250 to the administratrix, and $1,000 to the widow. The defendant alleged exceptions, which appear in the opinion.

*W. H. Brooks*, (*L. White & W. Hamilton* with him,) for the defendant.

*J. B. Carroll*, (*W. H. McClintock* with him,) for the plaintiff.

LATHROP, J.  The plaintiff's intestate was injured while engaged with others in taking down a piece of shafting in the defendant's mill, and died soon afterwards from the injuries received. The piece of shafting was called a generator shaft, and was seventeen or eighteen feet long. It had upon it two pulleys, one near each end. One of these pulleys was sixty inches in diameter, with a face of fourteen or sixteen inches. The other was fifty inches in diameter, with a face of twenty-five or twenty-six inches. From the fifty-inch pulley to the fly-wheel of an engine in the next room, there was a leather belt twenty-four inches wide, and over this belt from the fly-wheel of the same engine there was another belt to a pulley upon another shaft about four or six feet farther away from the engine than the generator shaft. The generator shaft was fastened to the ceiling of the room by means of four hangers. In order to lower the shaft, a hole was cut in the floor of the room above the generator shaft, and a chain was run through this hole, one end of which was fastened around the generator shaft, and the other

end attached to a cat's-paw hitch to chain falls suspended from the ceiling of the room above. The belts referred to were left in position. A timber, called a strut, was placed under the end of the shafting nearest the driving pulley already mentioned, and was held in position by means of a jackscrew, placed underneath the timber. The object of using this timber was to raise the end of the shaft under which it was placed out of the hanger-box. This object had been accomplished, and the work of lowering proceeded by letting out on the chain falls, and lowering on the jackscrew. Suddenly there was a jar. The cat's-paw hitch gave way, the timber under the end of the shafting came out, and the end of the shafting with the driving pulley upon it came against the plaintiff's intestate, who was working the jackscrew, causing the injuries which resulted in his death a short time afterwards.

At the trial there were many exceptions to the refusal to give certain rulings, and also to the admission and to the exclusion of evidence. So far as these were insisted upon at the argument, we proceed to consider them.

1. The third request for instructions was in substance that the plaintiff could not recover under the third count of the declaration. This was argued in connection with the ninth request, which was in substance that there was no evidence that the plaintiff's intestate was injured by reason of the negligence of any person in the service of the defendant intrusted with and exercising superintendence, whose sole or principal duty was that of superintendence. We are of opinion that these requests were rightly refused. One Kidder was the superintendent of the defendant company, and one Freeman was under him. There was evidence in the case from which the jury would have been warranted in finding that the accident was due to leaving the belt on the pulley, thus causing a side strain, and that this was not a proper way of doing the work. Kidder testified that he directed Freeman to have the shafting taken down, and added: " When I told Mr. Freeman about taking down this shafting we had some talk about whether or not the belt should be cut. I do not know whether Mr. Freeman thought it ought to be cut. It was by my direction that the belt should not be cut. We could have cut the belt and replaced it. The purpose of cutting

it would be to save the side strain that the belt would occasion upon the pulley as the shaft was being taken down."

As to whether Freeman was a superintendent, there was no doubt that he was a foreman in charge of a gang, of which the plaintiff's intestate was a member; but this fact alone does not determine the question whether his principal duty was that of superintendence. On this point the evidence was conflicting. There was testimony for the defendant which, if believed, would have warranted the jury in finding that he worked most of the time with his hands; while there was evidence for the plaintiff that he worked very little with his hands, and was principally employed in directing the men.

There can be no doubt, on the evidence, that the work of lowering the shafting was under the immediate direction of Freeman, and that he had the entire charge and control of the work. There was also evidence of negligence on his part in not using a fall at each end of the shafting instead of one in the middle, or, if one only was used, in not having it so placed that the weight of the shaft on each side would be equal. Freeman also ordered the strut and jackscrew to be used. On his cross-examination he testified : " Of course I was watching the stick all the time, looking at it most of the time. I could not say I observed any other part of the machinery much while the process of lowering was going on. If I had looked at the chain falls I would have known the strain of the belt was too great for the strut; those two hooks on the chain falls straightened out."

Under these circumstances it was a question of fact for the jury whether Freeman was a superintendent, and whether he was negligent. *Mahoney* v. *New York & New England Railroad,* 160 Mass. 573. *Gagnon* v. *Seaconnet Mills,* 165 Mass. 221. *Reynolds* v. *Barnard,* 168 Mass. 226. *Dean* v. *Smith,* 169 Mass. 569. *Gardner* v. *New England Telephone & Telegraph Co.* 170 Mass. 156. *O'Brien* v. *Look,* 171 Mass. 36.

2. The fourth request was that the plaintiff could not recover upon the fourth count of the declaration. This was argued with the eleventh request, which was: " There is no sufficient evidence that, at the time of the injury and death to the plaintiff's intestate, Freeman was acting as superintendent with the authority and consent of the defendant, and in the absence of the defendant's superintendent."

There was evidence in the case that Freeman was intrusted with the duty of superintending the work of lowering the shafting by the general superintendent of the defendant company, and that the superintendent took no charge of the work, and was not present. This brought Freeman within the purview of the St. of 1894, c. 499. We have already stated that there was evidence of his negligence.

3. The twelfth request was as follows: " There is no sufficient evidence that the plaintiff's intestate was not injured as a result of the risk of the employment, voluntarily assumed by him, and the plaintiff cannot recover in this action." This request was rightly refused. It cannot be said that the falling of the shaft was one of the ordinary risks of the employment. The plaintiff's intestate was not charged with any duty with reference to the method employed, and he had a right to assume that all proper precautions had been taken. " The risk which the workman assumes by virtue of his contract of employment does not include the risk arising from the negligent act of a superintendent." *Murphy* v. *City Coal Co.* 172 Mass. 324, 327, and cases cited.

4. The thirteenth request was, " There is no sufficient evidence that the death of, and injury to, the plaintiff's intestate was not caused by the negligence of a mere fellow servant, and the plaintiff is not entitled to recover." The defendant contended that the accident was caused by the slipping of the cat's-paw hitch, which was made by a fellow servant of the intestate. It is contended that after this hitch was made, a half hitch should have been made with the end of the chain, and that this would have rendered the cat's-paw hitch less likely to slip. But upon the evidence the jury might well have found that the side strain on the shafting caused by the belt was the cause of the accident. The instruction requested was therefore rightly refused.

5. The fourteenth request was, " There is no sufficient evidence that the negligence of the plaintiff's intestate did not contribute to his injuries and death, and the plaintiff cannot recover in this action." This request was rightly refused, because it assumes that the intestate was negligent. The question whether the intestate was in the exercise of due care is open,

however, on the general instructions asked for that the plaintiff was not entitled to recover, and may be conveniently considered here. The testimony relied upon to show negligence was that of one Snape, a fellow workman of the plaintiff's intestate, and was as follows: " Knight was lowering on the jackscrew, lowering right along, and I told him to stop, I thought he got too low; he said at one time he was almost down, but I did not tell him to stop at the time; Freeman, I believe, told him, told the crowd to stop, and he says, ' You have got two inches yet'; Freeman said there was two inches to lower; Knight did not lower any more until he got orders; he lowered the two inches, then I says, I felt the stick come loose, and I said, ' That is enough, Charley, hold up, that is enough, Charley'; then he turned the jack a little and the shaft came down; it came down immediately upon the turning of the jack." Snape was a witness summoned by the defendant, and put on the stand by the plaintiff. The testimony recited above was brought out on cross-examination. He was contradicted by a written statement which he signed the day after the accident. In this statement what is above recited did not appear. On the contrary he said: " I did not see any carelessness or negligence on the part of any one, and I considered everything was safe; I was working right beside Knight, and had I felt that everything was not safe, I would have spoken of it. Knight did not try to move the jack at all. . . . Knight was told to let down the jack a little, which he did, and we were waiting for further orders. The jack was free, and we had just stopped when the shaft came down." Freeman, who was present at the time, and who was a witness for the defendant, testified as follows: " Knight said he was pretty near down, and I said hold on; come to find out, he was not quite clear down. Jack Snape was holding the strut at that time; he held it true, everything was true. I was right in front, watching. Knight said he had got it down, but he had not quite. I spoke up, and asked him if the belt was getting loose, and he spoke up and said ' Yes.' He touched the belt, then I gave orders again to lower down, and he said he was clear down. Says I, ' Hold on '; and at that time everything came just like that. I did not see him give another turn on the screw. I could not tell whether he gave another turn on the screw. That shaft

came right down." On cross-examination Freeman testified: " Knight was working the jackscrew with the bar in the usual and customary way, and all that he did there with reference to the working of the bar and the screw was what I would customarily expect a man to do. He lowered down to a certain point and then he thought he had lowered as far as he could, and I told him he had a couple of inches more. I did not see the stick wobble. When we got down within about two inches, he said he guessed he was clear down, and I told him to see if the belt was loose ; he got up there, and the belt was loose, so I told him to lower down again." It seems to us clear that on this evidence the question of due care on the part of the plaintiff's intestate was for the jury.

6. The seventeenth request was, " There is no sufficient evidence that the plaintiff's intestate consciously suffered, and there can be no recovery upon that ground." The St. of 1887, c. 270, as amended by the St. of 1892, c. 260, allows the recovery by the widow or next of kin, both where the employee is instantly killed, or dies without conscious suffering, and where the death is not instantaneous or is preceded by conscious suffering. In the case at bar it clearly appears by the evidence that the death was not instantaneous, and the only question is whether there was evidence of conscious suffering. If an injured person remains conscious after the injury, even for a short time only, it is a reasonable conclusion that he lived in a state of conscious suffering. *Mulchahey* v. *Washburn Car Wheel Co.* 145 Mass. 281, 287, per Devens, J. In the case before us one witness testified that Knight said, " Oh ! I am gone." Freeman testified that Knight said, after the injury, " Boss, it is n't any use, I am done for." Brace testified : " I heard Knight holler once or twice; I heard him groan three or four times, and his eyes were open. I helped remove the shaft from him ; then three of us carried him down to the front door ; when we got him down to the front door he was dead." We are of opinion that, on this evidence, it was a question for the jury whether or not the death of the intestate was preceded by conscious suffering.

7. The nineteenth request was as follows : " The plaintiff is not entitled to recover in this action because the cat's-paw hitch was an improper hitch under the circumstances, or because said

hitch was improperly made." There was expert evidence in the case that the cause of the falling of the shaft was due to the fact that the cat's-paw hitch was made without a single or a double half hitch being afterwards made. The contention of the defendant is that as the hitch was made by a fellow workman of the intestate, the plaintiff could not recover if the fall of the shaft was owing to the hitch being improperly made, or if it were an improper hitch. There was, however, evidence that after the hitch was made Freeman came to the floor where the falls and the hitch were. Brace testified that Freeman came up stairs where the chain falls were; that he came up and looked around to see how things were, and then went down stairs again. "I supposed he looked at the tackle. I could not tell you everything he looked at. I had some talk with him with reference to what I had done there, and the condition of the pulleys." If, therefore, the jury should find that Freeman saw the hitch and made no objection to it, or should find that he failed in his duty of superintendence in not seeing that everything was right, there would be negligence of the superintendent, and not merely the fault of a fellow servant; and the request was rightly refused.

8. The twenty-third request was as follows : " The proximate cause of the fall of the shaft was the failure of Brace to so hitch the chain which sustained the weight of the shaft as to prevent said chain from slipping from the hook to which it was hitched." This request was rightly refused. The court could not say, as matter of law, what the proximate cause of the falling of the shaft was, or whether Brace failed to hitch the chain properly or not. These were questions of fact.

9. The twenty-fourth request is in substance the same as the nineteenth request; and is disposed of by what has already been said.

10. The twenty-sixth request was as follows: "If the plaintiff's intestate in giving an upward turn to the jack just before the accident caused his injury and death, then the plaintiff cannot recover in this action." This request was rightly refused. There was no evidence that the intestate was giving an upward turn to the jack just before the accident.

11. The twenty-seventh request was as follows: " There is

no sufficient evidence that the allowing of the belt to remain on the pulley caused or contributed to the accident, and there can be no recovery on that ground." This request was rightly refused, as there was abundant evidence that the belt on the pulley caused or contributed to the accident.

12. The thirtieth request was as follows: "The risk which resulted in injury or death of the plaintiff's intestate was a transitory risk of which the defendant was not required to notify said intestate, and the plaintiff cannot recover in this action." We are of opinion that this request was rightly refused. The case does not come within the rule laid down in *McCann* v. *Kennedy*, 167 Mass. 23, *Whittaker* v. *Bent*, 167 Mass. 588, or *Thompson* v. *Norman Paper Co.* 169 Mass. 416, relied upon by the defendant. It cannot be said to be a risk incident to and ordinarily to be expected to occur in the prosecution of the work in which the plaintiff was engaged. See *McCoy* v. *Westborough*, 172 Mass. 504, 507. Moreover, the plaintiff's cause of action was not based upon the absence of a warning, to which the rule of transitory risks especially applies.

13. Brace was asked whether the pulley or the belt upon the pulley situated as it was, and in the shape in which he saw it there, caused any strain upon this pulley which was being taken down. This was objected to on the ground that it was not a matter of expert knowledge, but for the jury. He answered, "I think it would." He was then asked: "And a strain in which direction?" and answered: "Towards the engine." The defendant in its brief contends that the witness had not qualified as an expert; but no such objection was taken at the trial, and it is not open here. Nor do we think that the objection taken is a sound one. As was said in *Tremblay* v. *Mapes-Reeve Construction Co.* 169 Mass. 284: "It [the evidence] concerned matters on which technical experience was instructive."

14. Rhoades was asked a series of questions bearing upon the same general subject included in the questions put to Brace. Only a general objection was made to each question. It is contended by the defendant that he was not shown to be an expert. This question is not open. Next it is urged that in one long hypothetical question, one element was omitted. As-

suming this to be so, a specific objection on this ground should have been made. It is further contended that the questions should have been excluded for the reason that they contain no elements requiring expert knowledge. This is disposed of by the case last cited.

15. Snape, who was called by the plaintiff, was an adverse witness, and the plaintiff was entitled to contradict him by other evidence, and to prove that he had made at other times statements inconsistent with his testimony. Pub. Sts. c. 169, § 22. The section concludes with these words: "But before such last mentioned proof can be given, the circumstances of the supposed statement sufficient to designate the particular occasion must be mentioned to the witness, and he must be asked whether or not he has made such statements, and, if so, allowed to explain them." Snape made a statement in writing directly after the accident which contradicted his testimony on material points. On re-direct examination, the statement was shown him, and he admitted his signature and that the questions appearing in the statement were put to him, and that the answers were made by him. The objection to the admission of the statement is a general one. The bill of exceptions does not give the questions and answers verbatim, but states the matter in a narrative form. It seems to us that as these are the defendant's exceptions, it sufficiently appears that the witness was asked whether he made the statement, and was allowed to explain it. See *Commonwealth* v. *Smith,* 163 Mass. 411, 425.

The defendant contends that the statement should not have been admitted because there were some expressions in it, not admissible either in direct or cross examination. No such objection was made at the trial. The effect of the judge's charge on this part of the case was that the statement was not to be treated as substantive evidence, but was to be used merely as affecting the testimony of Snape, if there was anything in it inconsistent with his testimony on the stand. The rights of the defendant appear to have been fully protected.

16. The last exception relates to the exclusion of this question put to Snape by the defendant: "Whether or not it was customary there, when a man or men were to lower or hoist a mechanism by the use of falls, for that man or men to make the

hitch in such a way as he saw fit?" The defendant offered to show that it was customary. The contention of the defendant is that this evidence was material on the question of the assumption of the risk by the plaintiff's intestate; but it does not appear that he knew this custom, if there was one. Indeed the case on which the defendant relies for the admissibility of the evidence proceeds upon the theory that the custom or method would tend to show neglect on the part of the defendant. *Coffee* v. *New York, New Haven, & Hartford Railroad*, 155 Mass. 21.

After the judge refused to allow the question to be put to Snape on cross-examination, evidence was introduced by the defendant, without objection, to the effect that it was usual and customary for the persons sent by Freeman to take shafting down, to make the hitch themselves, and Freeman testified, in this connection: "I did not think there was any necessity of supervision on my part."

We are of opinion that if the defendant sought to excuse an improperly made hitch, or want of supervision over it, by evidence that it allowed its workmen to make any sort of a hitch they saw fit, the evidence was incompetent, unless it was further shown that the plaintiff's intestate was aware of the practice. This does not appear. *Exceptions overruled.*