CHARLES G. EDGARTON, administrator, *vs.* H. P. WELCH Co. (and a companion case [1]).

Middlesex.    May 6, 1947. — September 11, 1947.

Present: QUA, C.J., LUMMUS, RONAN, & SPALDING, JJ.

*Negligence*, Electricity, Trespasser. *Evidence*, Relevancy and materiality, Competency. *Joint Tortfeasors. Trepass. Conscious Suffering. Motor Vehicle*, Trespass.

In an action against a power company for the death of the plaintiff's intestate, who was electrocuted through indirect contact with a broken electric wire in which the current had been automatically shut off when the wire had been broken and then had been turned on again by the operator of the company's substation after an interval of two minutes in accordance with a rule of the company, expert testimony offered by the plaintiff, that the company could have installed in the substation at reasonable expense and with little difficulty instruments well known in the electrical engineering world by which, during the two minute interval and without introducing a lethal current into the wire, the operator could have made tests indicating the existence and approximate location of the break and the existence of conditions there involving danger of lethal shock to one in the situation of the intestate if the full current were turned on, was relevant to the issue of the company's negligence and was erroneously excluded, especially where the company, before such testimony was offered, had raised the matter of the feasibility of tests in examination of its operator.

---

[1] The companion case is by the same plaintiff against the New England Power Company.

A finding of negligence of a power company toward a boy would have been warranted by evidence in substance that a truck in which the boy was riding struck a pole and broke a high voltage electric wire of the company, thereby automatically shutting off the current in the wire by a circuit breaker at a substation; that, in accordance with a rule of the company, an operator at the substation, after an interval of two minutes, had turned on the full current again without making inquiry by telephone into the existence or location of the break or the situation at the scene of the break; that such matters could have been revealed to him during the two minute interval by tests made at the substation if the company had installed there certain instruments which it would have been reasonably feasible for it to install; and that shortly after the current had been turned on again the boy was electrocuted by indirect contact with the broken wire.

A power company, if its negligence was a concurrent cause of the death of a boy through indirect contact with a broken high voltage electric wire, would not be relieved of liability for the death by the fact that it might have been attributable in part to negligence of one who caused the breaking of the wire.

A boy riding in a motor truck when, without voluntary act on his part, it went off a highway onto private land, where he was electrocuted by indirect contact with a wire of a power company which it had an easement to maintain on such land and which had broken and had fallen when the truck struck a pole, was not a trespasser respecting the power company, and the administrator of his estate was not precluded on that ground from maintaining an action for his death against the company.

A finding that a boy, electrocuted through indirect contact with a broken electric wire carrying a current of high voltage, suffered consciously would not have been warranted by evidence that upon the contact he started to say "Oh" and then fell to the ground dead.

The owner of a motor truck operated by his employee was not liable for the death of a boy who, by an unauthorized invitation of the operator, was riding in the truck when, through negligence of the operator, it went off the highway onto private property and came to rest there in a precarious position at the top of a steep bank and in contact with a high voltage electric wire broken by it, and who, without further negligence on the part of the operator, was electrocuted by simultaneous contact with the ground and with the truck after he had got out of the truck and while he was attempting to assist the operator to leave it.

Two ACTIONS OF TORT. Writ in the first action in the District Court of Central Middlesex dated July 15, 1943; writ in the second action in the Superior Court dated August 20, 1943.

Upon removal of the first action to the Superior Court, the actions were tried together before *Kirk*, J.

*T. M. Banks, Jr., (J. A. Perkins* with him,) for the plaintiff.

*R. N. Daley,* for the defendant New England Power Company.

*C. R. Flood,* for the defendant H. P. Welch Co.

SPALDING, J.     These are two actions of tort, brought by the administrator of the estate of Henry R. Edgarton, to recover for the death and conscious suffering of his intestate alleged to have been caused by the negligence of the defendants.[1]     In each case the judge, subject to the plaintiff's exceptions, directed verdicts for the defendant. The questions for decision are whether the judge should have submitted the cases to the jury, and whether he erred in excluding certain evidence offered by the plaintiff.

Facts which could have been found are these: At about 5 A.M. on August 22, 1942, the plaintiff's intestate was riding in a truck owned by the defendant H. P. Welch Co. and operated by one of its employees, Pollard, on Ashburnham Street, Fitchburg. The intestate, a boy of eighteen years, had got on the truck in Vermont. (It is agreed that Pollard had no authority to invite the intestate to ride with him.) The truck (which was described as a tractor and trailer type) was being operated on a regular freight run between Burlington, Vermont, and Somerville and was carrying eight or ten tons of merchandise. While going around a curve on Ashburnham Street, the truck, instead of following the curve, went straight on over a curbing and across a lawn until it came to a wooded bank "where there was a steep drop." Continuing down the embankment, the truck sideswiped a tree, and its rear end hit and broke off a pole on which electric wires were strung.

When the truck came to rest it was in a precarious position at the top of another steep bank. Up to this time neither the intestate nor Pollard had been hurt. Although the emergency brake was then set and the truck was in gear, its position was such that Pollard was afraid to take

---

[1] The declaration in the action against the New England Power Company contained counts alleging wilful, reckless, and wanton conduct, but these were waived.

his foot off the foot brake. Pollard told the intestate that he had better get out and take his luggage out as quickly as possible, as he was afraid that the truck might roll further. The luggage was stored in the rear of the trailer. Being unable to open the door next to him, the intestate crawled through a window, went around to the rear of the trailer and took out his luggage. To obtain his luggage it was necessary for him to open the rear doors of the trailer, which were latched. The intestate then came around to the side of the cab where Pollard was sitting and asked him if he could get out. Upon being told by Pollard that he was unable to open the doors, the intestate dropped his bags in order to assist him. He put his foot on the running board and as he did so he started to say "Oh" and then fell to the ground dead. [1] Pollard observed that as the intestate put his foot on the running board sparks appeared under his shoe. At about the same time sparks "started shooting off" all through the truck, and Pollard kicked the door open and jumped out. Sometime later the truck plunged down the second embankment to the street below and was wrecked.

The pole with which the truck collided was owned by the defendant New England Power Company (hereinafter called the power company) which operated a substation about a mile and a half away. At this station electricity was received at sixty-six thousand volts and was "stepped down" by transformers to thirteen thousand eight hundred volts. It was then transmitted to customers on "feeder" lines at the reduced voltage. "Feeder" No. 2 supplied nine mills of the Crocker Burbank Paper Company in Fitchburg. The pole with which the truck collided was carrying a "tap line" consisting of three wires from "feeder" No. 2 and supplied power to mill No. 5 of the Crocker Burbank company. These wires were not effectively insulated. When an overload on one of the lines occurred by reason of a short circuit it automatically opened a switch or circuit breaker at the substation which shut off the power. At 5:08 on the morning of the accident one of the switches opened and shut

---

[1] The cause of the intestate's death was electrocution.

off the power on "feeder" No. 2. By means of signalling devices located in the substation this fact was immediately made known to the operator in charge. This indicated to him that there "was trouble on the line somewhere" which might be temporary or permanent. The indicator on the ammeter at the substation had "swung off scale" at three hundred, which was its "full rating," and had stuck there. The normal load on the line was around one hundred amperes. Pursuant to a company rule, the operator allowed the current to remain off for two minutes and then turned it on. When "feeder" No. 2 was reënergized the automatic switch did not reopen and the power remained on until it was shut off a half an hour later at the request of the police. [1]

There was expert evidence from which it could have been found that the electric shock which killed the intestate occurred in the following manner. One of the broken wires of the "3-phase" circuit came in contact with the ground and another broken wire came in contact with the metal body of the truck. [2] Since the truck was standing upright, its rubber tires were a sufficient insulation to prevent the circuit being closed. When the intestate, with one foot on the ground, put the other foot on the running board he completed "the circuit and received thirteen thousand eight hundred volts through his body, from one foot to the other." There was evidence tending to prove that the intestate was electrocuted after the current had been turned on at the substation following the two minute interruption [3] mentioned above.

The plaintiff offered to prove, in substance, the following

---

[1] The fact that the automatic switch opened when the pole was knocked down but did not reopen after the line was reënergized was explained as follows: When the wires fell they came in contact with something that was of solid metal which would allow a sufficiently large current to flow through the lines to open the circuit breaker. That condition then changed so that one wire settled on the ground in such a way that it was imperfectly grounded, and the other wire was against the truck, but these wires were insulated from each other by means of the truck tires, consequently "no current could flow of sufficient magnitude to trip the circuit breaker again."

[2] Photographs taken shortly after the accident reveal two broken wires hanging down from the broken pole. The broken wires were long enough to reach the ground.

[3] It could have been found that this interruption would account for the fact that the intestate was able to get out of the truck, go to the rear, open the doors, and obtain his luggage without receiving a shock.

through a witness who had qualified as an electrical expert: As soon as the current was automatically shut off at 5:08 A.M. due to the short circuit, tests could have been made at the substation which would have indicated to a competent operator familiar with testing apparatus that "wires were down on the circuit." They would also have shown that at the point of the break two of the wires (which normally would not be grounded) were in contact with the ground, and that one of those wires was in sufficiently good contact with the ground to pass a lethal current. Tests which would have recorded this situation could have been made during the two minute interval when the current was shut off "without introducing any lethal voltage into the circuit." Had these tests been made they would have indicated to the substation operator that conditions existed in which, if the full voltage were restored to the circuit, any person standing on the ground who came in contact with the wires or with any metal object touching an ungrounded wire would have received substantially the full voltage of the line through his body. Moreover these tests would have shown within a very few yards where the break was, and, by isolating the broken wires, power could have been restored to all the mills on the circuit except the one mill supplied by the broken tap line. Such tests could be made by instruments well known for many years to the electrical engineering world. These instruments are not unduly expensive and could be installed on the circuit and at the substation involved in this case at reasonable expense and with little difficulty. Tests of this sort have been used for such purposes for many years and they could be made without any danger to any person who might come in contact with a broken wire at the scene of an accident.

1. All of this offered testimony was excluded subject to the plaintiff's exception. [1] We are of opinion that it ought

[1] When this evidence was excluded the following colloquy took place: "The JUDGE. Mr. Banks [plaintiff's counsel], so far as in your offer of proof you included certain items that were the subject of expert interpretation, as to what might have happened at the scene of the accident, I do not exclude such things, but I am excluding such aspects of your offer of proof as bear upon the device that might have been resorted to by the defendant power company to detect or otherwise ascertain more accurately what the situation was along its power lines. COUNSEL FOR THE PLAINTIFF. I so understood it, your Honor."

to have been admitted.  In *Dolan* v. *Boott Cotton Mills*,
185 Mass. 576, it was said by Knowlton, C.J., at page 579,
that "On the question whether the use of a particular
machine or appliance by a defendant is negligent, a jury may
properly consider all facts that throw light upon it.   The
possibility and the ease or difficulty of procuring something
different which is safer and better are important facts
bearing upon it.   That something safer has been invented
and is in common use is ordinarily a fact of considerable
significance.   Evidence of this kind is often received in
such cases."   To the same effect are *McMahon* v. *McHale*,
174 Mass. 320, 325, *Draper* v. *Cotting*, 231 Mass. 51, 59,
*Robitaille* v. *Netoco Community Theatre of North Attleboro,
Inc.* 305 Mass. 265, 268.   Because of the danger of raising
collateral issues much is properly left to the discretion of
the trial judge in determining whether such evidence ought
to be admitted.   *Veginan* v. *Morse*, 160 Mass. 143, 148.
*McCarthy* v. *Boston Duck Co.* 165 Mass. 165, 169.   *Reidy* v.
*Crompton & Knowles Loom Works*, 318 Mass. 135, 142.
Here the excluded evidence bore directly on the principal
issue in the case, namely, the negligence of the power com-
pany.   Whether it was negligent in its operation of the
substation at the time of the accident was a matter the
jury could not be expected to decide on the basis of knowl-
edge that they had.   Whether better methods or devices
than those employed by the power company should have
been employed were matters which it was proper to sub-
mit to the consideration of the jury to enable them to pass
on the question before them.   Moreover, it appears that,
before the evidence was offered, the power company had
put in issue the matters to which it pertained through its
examination of the operator of the substation.   See *Common-
wealth* v. *Leach*, 156 Mass. 99, 103–104.   He had testified
that he knew of no test that could be made that was feasible
to determine what trouble existed along the line before re-
energizing it;   that in order to find the location of the
trouble the line "would have to be left dead, disconnected
from all possible sources of current and a gang of men sent
out to walk every inch of the feeder to find out where the

trouble was"; that this would probably involve a day and a half; and that he knew of no test to determine whether the wires were grounded without energizing them. In the circumstances here disclosed we are of opinion that the plaintiff was entitled, as of right, to introduce the excluded evidence. The "mere fact that a collateral issue may be raised is not of itself enough to justify the exclusion of evidence which bears upon the issue on trial." *Bemis* v. *Temple*, 162 Mass. 342, 344.

2. Considering the evidence which was introduced together with that which was erroneously excluded, we think that the plaintiff was entitled to go to the jury in the case against the power company. The power company, of course, was not an insurer. It was required to exercise care that was reasonable in the circumstances. But inasmuch as electricity is a highly dangerous force, those employing it are properly held to a correspondingly high degree of care in its use. *O'Donnell* v. *Boston Elevated Railway*, 205 Mass. 200, 202. *Dierks Lumber & Coal Co.* v. *Brown*, 19 Fed. (2d) 732, 735 (C. C. A. 8). *McCormick* v. *Great Western Power Co.* 214 Cal. 658. *Knowlton* v. *Des Moines Edison Light Co.* 117 Iowa, 451, 455. *Hagerstown & Frederick Railway* v. *State*, 139 Md. 507. *Bunten* v. *Eastern Minnesota Power Co.* 178 Minn. 604, 607. *Small* v. *Southern Public Utilities Co.* 200 N. C. 719. *Burdick* v. *South County Public Service Co.* 54 R. I. 310, 314. The evidence warranted a finding that the intestate was electrocuted after the lines had been reënergized by the operator at the substation following the two minute interval when the current was off. It is not disputed that the operator knew that the circuit breaker had opened and that trouble existed somewhere on "feeder" No. 2. He knew that this particular line ran for almost its entire distance along or near the public streets of Fitchburg. He also knew that there would be no serious interruption of service by failing to reënergize the line, since only one mill (not then in operation) was being supplied by this line. There was no evidence of any electrical storm in the vicinity which, according to the evidence, sometimes caused an overload on the lines. The

operator testified that the most likely cause of the trouble was some failure of equipment on the premises of a customer, but he made no attempt to eliminate that possibility. That could have been accomplished by a telephone call to the Crocker Burbank company. In view of the danger attending the transmission of electricity, these facts taken in conjunction with the excluded testimony would have warranted the jury in concluding that the power company was negligent either in reintroducing the current into "feeder" No. 2 after it knew or ought to have known that trouble existed on the line which might endanger persons who might be in the vicinity, or in not equipping its station with the necessary equipment to enable it to discover the cause and place of the trouble with greater accuracy. Support for this conclusion may be found in three comparatively recent cases decided by the Court of Errors and Appeals of New Jersey, *Gereghty* v. *Wagner,* 117 N. J. L. 174, *Robbins* v. *Thies,* 117 N. J. L. 389, *Adams* v. *Atlantic City Electric Co.* 120 N. J. L. 357. The facts in the case last cited bear a striking resemblance to those in the case at bar. That the intestate's death might also have been attributable in part to the negligence of Pollard in going off the road and knocking down the pole would not relieve the power company of liability if its negligence was a concurrent cause of death. *Brown* v. *Thayer,* 212 Mass. 392, 397. *Meech* v. *Sewall,* 232 Mass. 460, 461. *Luff* v. *Mahlowitz,* 296 Mass. 206, 207.

3. The power company argues that even if there was evidence which would warrant a finding that it was negligent, yet the plaintiff is barred from recovery because the intestate's status on the land where the accident happened was that of a trespasser or licensee. If the intestate was merely a trespasser or licensee with respect to the power company the plaintiff could not recover, for there is no evidence of wanton or reckless conduct on its part. It appears that the land on which the accident occurred was owned by O. S. Cook & Sons Company, and that the power company had acquired, for a term of fifteen years, "The right and easement to construct, reconstruct, repair, maintain, operate and patrol,

for the transmission of high and low voltage electric current and for telephone use, a line of poles consisting of not over two poles." It also had the "right and easement . . . to cut, trim and remove such trees and underbrush as may in the opinion of the said lessee interfere with or endanger said line."

But this contention cannot prevail. Considering the manner in which the truck came in contact with the property of the power company, the intestate was not a trespasser. The trend of modern authority is than an unintended intrusion upon the land in possession of another does not constitute a trespass. *Feiges* v. *Racine Dry Goods Co.* 231 Wis. 270. *Puchlopek* v. *Portsmouth Power Co.* 82 N. H. 440, 442. *White* v. *Suncook Mills,* 91 N. H. 92, 97–98. *Durst* v. *Wareham,* 132 Kans. 785, 789. *Peacock* v. *Nicholson,* 11 T. L. R. 225. *Gayler & Pope, Ltd.* v. *B. Davies & Son, Ltd.* [1924] 2 K. B. 75. Prosser on Torts, pages 77–78. This view has been adopted by the American Law Institute. The rule formulated by the Institute is that "Except where the actor is engaged in an extra-hazardous activity, an unintentional and non-negligent entry on land in the possession of another or causing a thing or third person to enter the land, does not subject the actor to liability to the possessor, even though the entry causes harm to the possessor or to a thing or third person in whose security the possessor has a legally protected interest." Restatement: Torts, § 166. As pointed out in comment c, this rule not only deals with nonliability for trespass of an accidental intrusion on land in the possession of another but it has a further importance in that it removes the actor from the class of trespassers and relieves him from the burdens incident thereto in an action against the possessor. See also Restatement: Torts, § 158, comment e. Recent decisions of this court tend to support this rule. See *United Electric Light Co.* v. *Deliso Construction Co. Inc.* 315 Mass. 313, 318; *Marengo* v. *Roy,* 318 Mass. 719, 721. In the *United Electric Light Co.* case it was said at page 318, "A trespass requires an affirmative voluntary act upon the part of a wrongdoer and in that respect differs from negli-

EDGARTON v. H. P. WELCH CO.

gence." In the case at bar there was no voluntary act on the part of the intestate which brought either him or the truck in which he was riding in contact with any property of the power company. The plaintiff was therefore entitled to go to the jury on the count for death.

4. But the verdict was properly directed for the defendant power company on the count for conscious suffering. The only evidence of conscious suffering was that as the intestate put his foot on the running board of the truck he "started to say 'Oh.'" Whether, in view of the fact that his death occurred immediately thereafter, this attempted utterance by the intestate was a result of a conscious effort or was purely a reflex action, is purely speculative. We think that this aspect of the case is governed by *Royal Indemnity Co.* v. *Pittsfield Electric Co.* 293 Mass. 4, 8–9, *Allicia* v. *Boston, Revere Beach & Lynn Railroad*, 294 Mass. 488, 490, and *Melnik* v. *Perwak*, 295 Mass. 512, rather than by *Boutlier* v. *Malden*, 226 Mass. 479, 488, on which the plaintiff relies.

5. It remains to consider whether the case against the H. P. Welch Co., the owner of the truck, ought to have been submitted to the jury. It is conceded that its employee Pollard was without authority, express or implied, to invite the intestate to ride on the truck on the day of the accident. In these circumstances there would be no liability to the plaintiff on the part of the H. P. Welch Co. arising out of Pollard's conduct up to the time the truck came to a stop. This aspect of the case is governed by *O'Leary* v. *Fash*, 245 Mass. 123, and *Little* v. *Levison*, 316 Mass. 159. Those cases hold that where the plaintiff was invited to ride in the defendant's automobile by an employee who lacked the authority to extend the invitation, the defendant would not be liable to the plaintiff for the conduct of his employee in driving the automobile, including conduct which was reckless and wanton, since the employee was not acting within the scope of his employment when the plaintiff was injured and the defendant owed no duty to the plaintiff. That principle is controlling here.

It is not necessary to determine whether, after the truck

came to a stop, there was a change in the status of the intestate with respect to the truck. (See *Conley* v. *Rosenfield*, 271 Mass. 433; *Ruel* v. *Langelier*, 299 Mass. 240; *Head* v. *Morton*, 302 Mass. 273; *Bragdon* v. *Dinsmore*, 312 Mass. 628. Compare *Fone* v. *Elloian*, 297 Mass. 139.) Even if the unauthorized ride of the intestate was at an end, there would be no basis for recovery against the H. P. Welch Co. Nothing that Pollard did or failed to do after the truck came to a stop would warrant a finding that he was negligent. Nor is it necessary to discuss the imminent peril doctrine invoked by the plaintiff. (See *Linnehan* v. *Sampson*, 126 Mass. 506; *Dixon* v. *New York, New Haven & Hartford Railroad*, 207 Mass. 126, 130.) As the case last cited points out, that doctrine is applied only where the situation which invites rescue is created by a tortious act of the defendant or of one for whom he is responsible. See Restatement: Torts, §§ 443, 445 and comments. Even if Pollard got into his predicament through his own negligence, such negligence occurred, as pointed out above, in circumstances which would furnish no basis for rendering his employer liable to the plaintiff.

It follows that in the case against the power company the plaintiff's exceptions must be sustained and in the case against the H. P. Welch Co. the plaintiff's exceptions must be overruled.

*So ordered.*