ARLINE M. CARR, administratrix, *vs.* ARTHUR D. LITTLE, INC.

Middlesex.   November 6, 1964. — February 8, 1965.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, KIRK, & REARDON, JJ.

*Workmen's Compensation Act,* Common employment, Action against third person. *Conscious Suffering.*

Evidence in an action warranted a finding that a manufacturer, an insured under the Workmen's Compensation Act, G. L. c. 152, who contracted with an insured industrial engineer to fabricate and assemble a

tank for a project of one of the engineer's customers did not, within § 18 of the act, contract with the engineer to participate in a "cold test" of the tank which the manufacturer agreed, at the engineer's request, could be conducted by the engineer at the manufacturer's plant; and upon such a finding the doctrine of "common employment" would not bar recovery against the engineer under § 15 of the act for the death of the manufacturer's shop foreman due to negligence of the engineer in using in the tank an unsuitable material which shattered during the "cold test." [473–474]

Review of cases on the subject of conscious suffering on the part of an injured person before his death. [475–477]

Evidence that one who sustained extensive brain injury in an accident had difficulty in breathing, moaned and groaned, clenched and unclenched his hands, moved his head and hand slightly toward his wife when she called his name, and moved his toes when the sole of his foot was stroked did not warrant a finding of conscious suffering on his part before he died two days after the accident. [477–478]

TORT. Writ in the Superior Court dated February 26, 1960.

The action was tried before *Taveira, J.*

*Philander S. Ratzkoff* for the defendant.

*Joseph P. Rooney* (*Stephen A. Moore* with him) for the plaintiff.

KIRK, J. This is an action at law under G. L. c. 152, § 15, for the death (count 1) and the conscious suffering (count 2) of Leo A. Carr, a shop foreman employed by Tech Welding Corporation (Tech). The jury returned a verdict for the plaintiff on each count. The defendant, Arthur D. Little, Inc. (Little), had seasonably filed motions for a directed verdict on each count. Little's exceptions to the denial of these motions bring the case to us. Little contends, as to both counts, that, with Tech, it was a common employer of Carr and therefore under our construction of G. L. c. 152, §§ 15, 18, it is not liable in this action at law, and that, as to count 2, there was no evidence of conscious suffering to take the case to the jury.

Certain facts are stipulated in the bill of exceptions: Carr did not reserve his common law rights against Tech or Little. On August 14, 1959, when Carr was injured, both Tech and Little were insured in compliance with the Workmen's Compensation Act, G. L. c. 152. The action is

brought by Tech's insurer which has paid compensation and medical benefits to or for the benefit of Carr and his surviving beneficiaries.

In considering the propriety of the denial of the motions for directed verdicts, we summarize and view the evidence in the light most favorable to the plaintiff. *Duff* v. *Webster,* 315 Mass. 102, 103. *Tindall* v. *Denholm & McKay Co.* 347 Mass. 100, 101. Among its several enterprises, Little is engaged in many phases of industrial engineering, including physics and chemical engineering. Tech's business is the fabrication of metals. It fills special orders for customers, and it manufactures for sale through jobbers stock truck tank bodies and underground storage tanks for fuel and gasoline. Little undertook to furnish the Pesco division of Borg-Warner (Pesco) a vessel for the purpose of testing pumps under exposure to liquid oxygen.

The design, fabrication and tests for final performance of the project were under the direction of one Hunsaker, an employee of Little. Pesco's contract with Little required that Little conduct the final performance tests of the project. Tech agreed with Little to manufacture, as part of the project, a tank which in concept was similar to a giant thermos bottle lying horizontally; an outer shell of carbon steel seventeen feet long and five and one-half feet in diameter and an inner shell of stainless steel sixteen feet long and four and one-half feet in diameter. The inner tank was supported on blocks to keep it from touching the outer shell. At the middle of the bottom of the tank was a hatch or bubble, which included a "pant leg" or tube affording access to the inner shell for the insertion of objects which were to be exposed to the liquid oxygen.[1] The surface of the part of the "pant leg" which reached the inner shell was called a "pump blank-off" or plate. Its inner surface was exposed to the atmosphere within the inner shell. The plate was ordered by Little from another manufacturer. It was made of carbon steel. If carbon steel is exposed to

---

[1] Or nitrogen, as an experimental substitute.

low temperatures it becomes brittle and can break. Except for the plate on the "pant leg," the whole inner shell was made of stainless steel which, when exposed to very low temperatures, has a much higher resistance to pressure than carbon steel. Persons skilled in the trade can distinguish by observation between carbon steel and stainless steel.

In accordance with the custom in the industry, Tech's agreement with Little was oral, subsequently confirmed by written orders (a purchase order and two change orders). Tech's job was to fabricate, assemble and deliver the tank. Tech agreed to perform and was equipped to perform certain tests, such as hydrostatic tests, to detect leaks in the tank and to correct them if caused by welding work or materials made by it. It was not equipped to do the finer work of detecting minute leaks, such as by the use of the mass spectrometer. Tech was not responsible for repairs made necessary by design failure. It did not agree to make and was not equipped to make final performance tests, such as the "cold test" which would involve the introduction of liquid nitrogen into the inner shell. In order that Little could expedite its overall job for Pesco, Tech agreed, at Little's request, to let Little conduct the cold test at Tech's plant, provided the test did not interfere with Tech's regular operations and preferably if the test were done after hours. On August 12, when the first cold test, under the supervision of Hunsaker, was under way, a leak in the gasket was discovered. Carr was consulted. The next day a large gasket was put on. No testing was involved in the latter job. "This was strictly a job of disassembly and assembly." Tech then had completed what was called for by the orders from Little.

No warning was given to Tech or to Carr by Little about the cold test or as to what steps were involved in it. Little ordered the liquid nitrogen. Hunsaker was conducting the cold test when Carr was injured. As shop foreman, Carr had overall supervision of the operations in the shop and of Tech's shop employees. His duties with respect to the work on the tank were only incidental to his general duties as shop foreman. Tech had as many as fifteen or twenty

other projects in process on the day of the accident and Carr was supervising them all. He was standing, bent over, looking at a gauge on the tank when the plate on the "pant leg" fragmented. The carbon steel plate was unsuitable for the purpose and its use by Little was the cause of the accident.

The purchase order and the change orders were in evidence. Neither the purchase order nor the change order issued before the accident mentioned the cold test. A change order issued after the accident authorized payment for all the work done prior to the accident. It did not refer to the cold test or give any particulars as to what the authorized work was. Tech's president never agreed to assist Little "in the form of employees for the cold test" nor did he ever say that Tech would "undertake any responsibility in connection with the cold test."

It is not disputed that Little was negligent and that Carr was in the exercise of due care. Since the action is brought by Tech's insurer under G. L. c. 152, § 15, we apply the rule which has evolved from our reading together of G. L. c. 152, § 15 and § 18. If under G. L. c. 152, § 18, Little was a common employer of Carr, it is not a "person other than the insured" and Tech's insurer may not, under G. L. c. 152, § 15, proceed at law against Little. *Bindbeutel* v. *L. D. Willcutt & Sons Co.* 244 Mass. 195, 197–198. *Clark* v. *M. W. Leahy Co. Inc.* 300 Mass. 565, 567–568. *McPadden* v. *W. J. Halloran Co.* 338 Mass. 189, 190.

We think that the evidence presented a question of fact as to the existence of common employment (*Caton* v. *Winslow Bros. & Smith Co.* 309 Mass. 150, 154; *Harrington* v. *H. F. Davis Tractor Co. Inc.* 342 Mass. 675, 679) and does not require, as the defendant contends, a ruling that, as matter of law, there was common employment. *Carlson* v. *Dowgielewicz,* 304 Mass. 560, 563. *McPadden* v. *W. J. Halloran Co.* 338 Mass. 189, 192. *Tindall* v. *Denholm & McKay Co.* 347 Mass. 100.

The existence of a contract, written or oral, between Tech and Little is an essential element of Little's affirmative de-

fence of common employment. *Harrington* v. *H. F. Davis Tractor Co. Inc.* 342 Mass. 675, 677. Admittedly, Tech had contracted with Little to fabricate and assemble the tank. The evidence, however, did not require a finding that participation in the cold test was part of Tech's contract with Little or was the subject of a separate contract between them. The issue was, therefore, properly submitted to the jury, and their verdicts, unless otherwise untenable, must stand. *Dubois* v. *Soule Mill,* 323 Mass. 472.

We now consider the defendant's exception to the denial of its motion for a directed verdict on the count for conscious suffering. Here also we evaluate the evidence in its aspect most favorable to the plaintiff. *Duff* v. *Webster,* 315 Mass. 102, 103.

Carr was found, following the accident, lying on the floor bleeding and with an injury to the right side of his head. He was put on a stretcher. He was having difficulty breathing. He moaned and groaned every half minute or so. During the ambulance trip to the hospital, which took approximately ten minutes, he "tighten[ed] up and relax[ed]. His hands were grasping, opening and closing, clenching." The moaning and groaning continued throughout the trip and after arrival at the hospital. A tracheotomy was performed to ease his breathing. When the tube in his throat became clogged, as it frequently did, the gasping of Carr increased; when it was cleaned his breathing became easier, he did not struggle as much and he seemed more relaxed.

On one occasion, when the plaintiff, a registered nurse, called her husband's name several times, he moved his head very slightly toward her and moved his hand with his fingers toward her. On three occasions on August 15, the plaintiff ran her finger down the sole of Carr's foot (a form of plantar stimulation) and the toes moved. There was moaning and groaning at times. The next day (August 16) his breathing became slower and quieter, then shallower. Carr died that afternoon.

A qualified neurologist, called by the defendant, was the only medical witness in the case. He examined the hospi-

tal record, the nurses' notes and the reports of the physician and the consultants. He testified that the records showed that Carr received extensive damage to the brain with laceration of the brain tissue itself, which eventually caused his death, and that it was his opinion that Carr was never conscious following the accident.

The doctor testified that the rather vigorous response to plantar stimulation was not any indication of consciousness. Similarly, moaning and groaning could occur in either a conscious or an unconscious person. He stated that the movement of the head and hand of Carr toward the speaker in response to a voice was not necessarily indicative of consciousness because it may have resulted from a reflex through the ear.

He further stated that spasmodic movements by themselves are not evidence of consciousness. He agreed that under certain conditions, "one symptom, or, at least, one reaction of the ordinary human being to intense pain is to clench the hands." He agreed that "the average man in the dentist's chair is likely to grab the sides of the chair," or if in pain to clench his hands. He testified that the clenching of the hand is some indication of the person feeling pain, anger or strong emotion.

The neurologist stated that the word "consciousness" in his testimony meant sufficient human awareness to experience pain or a sensation which is called suffering.

"[T]o permit the assessment of damages for bodily mutilation or physical or mental suffering there must have been pain or at least consciousness of injury. . . . [Citations omitted.] The burden of proof in these matters is on the plaintiff." *Royal Indem. Co.* v. *Pittsfield Elec. Co.* 293 Mass. 4, 8. In order to create an issue for the jury the plaintiff must show, as more than a matter of speculation, that the movements, acts or appearance of the decedent following the injury were the result of or indicative of conscious effort or suffering. *Melnik* v. *Perwak,* 295 Mass. 512, 513. *Alden* v. *Norwood Arena, Inc.* 332 Mass. 267, 274. *Ghiz* v. *Wantman,* 337 Mass. 415, 419.

This court has held that moaning and groaning and the movements of head and lips are equally consistent with consciousness and unconsciousness, and that consequently such evidence alone is insufficient to warrant submitting the case to the jury. *Melnik* v. *Perwak,* 295 Mass. 512, 513. *Allison* v. *Sessa,* 302 Mass. 302, 304. *Alden* v. *Norwood Arena, Inc.* 332 Mass. 267, 274. *Ghiz* v. *Wantman,* 337 Mass. 415, 419. If the only evidence of consciousness is of acts which are by common knowledge ambiguous, a verdict should be directed for the defendant on conscious suffering. *Allicia* v. *Boston, Revere Beach & Lynn R.R.* 294 Mass. 488, 490. *Edgarton* v. *H. P. Welch Co.* 321 Mass. 603, 613. *Ghiz* v. *Wantman,* 337 Mass. 415, 419.

There are a few types or combinations of acts by a decedent which this court has held to be sufficient, without supporting medical testimony, to carry the case to the jury on the issue of conscious suffering. Thus, in *Markell* v. *Gahm,* 343 Mass. 468, 470–471, there was evidence that the decedent tried to raise himself on both hands but desisted when told to remain quiet. At the hospital, when personnel tried to take his wallet, he "sort of rolled over and tried to prevent them . . . using his left hand." It was held that it could be inferred that he consciously responded to the direction to remain quiet and consciously attempted to protect his property and thus the issue was for the jury.

In *Isaacson* v. *Boston, Worcester & N. Y. St. Ry.* 278 Mass. 378, 391–392, the decedent stood in the middle of flames groping with his hands. Then he fell, tried to stand, and fell again. The court held that a conscious attempt to escape the flames could be inferred. See also *Campbell* v. *Romanos,* 346 Mass. 361, 367. In *Allison* v. *Sessa,* 302 Mass. 302, 303–304, the hospital record indicated that the decedent, during the seven days he lived after the injury, was "more rational" on two occasions, "roused" on two different occasions, and once answered to his name and talked a little. The court held that the jury might properly infer from these acts that the injured party was conscious. In other cases evidence that the decedent spoke after the

injury has been held sufficient to raise a jury question on conscious suffering. *Knight* v. *Overman Wheel Co.* 174 Mass. 455, 463. *Boutlier* v. *Malden,* 226 Mass. 479, 487–488. *Battany* v. *Wall,* 232 Mass. 138, 140–141. Cf. *Edgarton* v. *H. P. Welch Co.* 321 Mass. 603, 613.

On the other hand evidence of acts which to a layman are ambiguous have been held sufficient to raise a jury issue when supported by expert medical testimony that the particular movements, acts or appearance of the decedent were in the expert's opinion indications of consciousness. *Fulton* v. *Edison Elec. Illuminating Co. of Boston,* 303 Mass. 258, 264–265. *Alden* v. *Norwood Arena, Inc.* 332 Mass. 267, 273.

The foregoing review of our cases on this subject leads to the conclusion that they may be classified in three categories. 1. Cases wherein the sounds, movements, or both, of the decedent are insufficient in the light of common experience and present medical knowledge to warrant a finding of conscious suffering. 2. Cases wherein the acts, utterances or both are sufficient in the light of common experience to warrant a finding of conscious suffering regardless of expert medical testimony. 3. Cases wherein the sounds, movements, or both, are insufficient to warrant laymen finding conscious suffering, but which when supported by interpretive expert medical testimony could warrant a finding of conscious suffering.

In this case the acts of and sounds from Carr, considered either singly or cumulatively, are not in themselves sufficient evidence of consciousness to raise a jury question. The ambiguity of moans and groans has already been discussed. The reaction to plantar stimulation and the movement of Carr's head and hand in response to the calling of his name were, as the medical expert testified, as consistent with unconsciousness as consciousness.

The evidence of the clenching and unclenching of the hands does not stand on any better footing. The act is not of the type from which consciousness may be inferred by laymen. The doctor testified that it was his opinion from

the medical records that Carr was never conscious and that spasmodic movements by themselves are not evidence of consciousness. The hypothetical questions on the clenching of the hands were cast in terms of "the ordinary human being" and "the average man in the dentist's chair." The neurologist's answers related to the actions of a person by hypothesis conscious and do not represent an opinion that the clenching of the hands in the instant case was an indication of consciousness.

"The evidence of conscious action is at most speculative, and does not meet the burden of proof of conscious suffering which is upon the plaintiff, and without which there can be no recovery by the plaintiff." *Allicia* v. *Boston, Revere Beach & Lynn R.R.* 294 Mass. 488, 490. *Melnik* v. *Perwak,* 295 Mass. 512, 513–514. *Ghiz* v. *Wantman,* 337 Mass. 415, 419.

The defendant's exceptions are overruled as to count 1 and are sustained as to count 2.

*So ordered.*