PASQUALE B. BALDASSARE, administrator, *vs.* CROWN
FURNITURE CO., INC.
(and three companion cases[1]).

Suffolk.   February 3, 1965.— May 4, 1965.

Present: WILKINS, C.J., SPALDING, CUTTER, SPIEGEL, & REARDON, JJ.

*Negligence,* Dangerous work, One owning or controlling real estate, Independent contractor, Repair work, Dangerous building, Causing death. *Landlord and Tenant,* Control of premises, Nuisance, Landlord's liability to third person.   *Practice, Civil,* Auditor: constitutionality; Action for death.   *Constitutional Law,* Trial by jury, Due process of law, Auditor.   *Building.   Nuisance.   Death.   Conscious Suffering.*

Reference of an action at law to an auditor, findings not final, and submission of his report to the jury do not infringe the parties' right to a trial by jury or to due process of law.   [189–191]
Findings of an auditor respecting the circumstances in which, during repairs by independent contractors to remedy an unsafe condition of a store building bordering a city street, a number of jacks which had been installed to shore up the building were removed contrary to instructions of an inspector of the city's building department, whereupon

———
[1] These are Pasquale B. Baldassare, administrator, *vs.* Dora Fagelman, Brick Bar Cafe, Inc. & others *vs.* Crown Furniture Co., Inc., and Lawrence Di Rocco & another *vs.* Crown Furniture Co., Inc.   Some verdicts were by agreement.

the roof of the building collapsed, knocking outward a part of a brick wall along the street and causing an "avalanche of brick" to fall into the street, justified conclusions of the auditor that the repair work was inherently dangerous and that a tenant of the building responsible for carrying out the work was negligent toward members of the public injured by the falling bricks. [191–192]

Although it was not shown that the owner of a store building bordering a city street, at a time when she gave an "oral lease" of the building to a corporation whose officers were closely related to her, knew or should have known of an unsafe condition of the building later discovered, and under the lease the tenant was responsible for all repairs of the building, the owner in all the circumstances might properly be found to have at least shared in the control of the building and in the duty to take precautions against injury to members of the public from inherently dangerous work done by independent contractors in remedying the unsafe condition. [192–194]

In actions by an administrator against the owner and a corporate tenant of a building under G. L. c. 229, § 2C, as amended through St. 1951, c. 250, for the death of the plaintiff's intestate resulting from repair work done on the building, where the tenant was not the owner's agent but the basis of recovery against both was negligence of the same persons imputed to both under the principles of agency, without personal fault on the part of the owner, the amount collectible from each defendant was no more than the damages awarded against that defendant, plus interest and costs, and amounts collected from one of the defendants, other than for costs, must be credited against the liability of the other defendant. [194–195]

Whether a boy mortally injured by bricks falling from a building under repair suffered consciously at any time before his death shortly after the accident was left conjectural by the evidence. [189, 195]

FOUR ACTIONS OF TORT. Writs in the Superior Court dated September 11, 1958, and September 26, 1958.

The actions were tried together before *Cahill, J.* Verdicts for the plaintiff administrator for the death of his intestate against Crown Furniture Co., Inc., and Dora Fagelman were in the sums of $18,000 and $16,000, respectively.

*John H. Fletcher Calver & John F. Finnerty* for the defendants.

*Francis V. Matera (David B. Cushman, James Zafarana, & Thomas B. Shea* with him)', for the plaintiffs.

CUTTER, J. These four actions of tort seek to recover (a) for injuries and property damage suffered by certain plaintiffs and (b) for the death and alleged conscious suf-

fering of Baldassare's intestate, Louis Baldassare (Louis), because of the collapse of a building in East Boston owned by Dora Fagelman (Dora) and leased by Crown Furniture Co., Inc. (Crown). The cases were consolidated for trial and referred to an auditor (findings not final). There were verdicts (a) on the statutory death claim counts, based on negligence and nuisance, for the administrator of Louis' estate against Crown and against Dora; (b) for Brick Bar Cafe, Inc., and others against Crown; and (c) for Lawrence Di Rocco and Richard Di Rocco against Crown. Verdicts for Crown and for Dora were directed on counts by the administrator based on Louis' alleged conscious suffering.

Crown and Dora present exceptions (a) to the denial of motions to recommit the auditor's report, to strike that report, and to reading the report to the jury, and (b) to the denial of their motions for directed verdicts on the counts other than those relating to Louis' alleged conscious suffering. Baldassare presents exceptions to the judge's action in directing verdicts for Crown and Dora on the conscious suffering counts. The evidence is stated in its aspect most favorable to the plaintiffs.

### Facts Applicable to all Four Cases.

A four story brick building at 228 Meridian Street, East Boston, was owned by Dora on February 20, 1958, the date of the accident. In an answer to an interrogatory she admitted that she then controlled the building. She, in her name as owner, carried fire and liability insurance on the building. The building was assessed to her for taxation.

The "premises were, in their entirety, leased to Crown . . . under an oral lease, whereby the tenant was responsible for all building repairs." The tenancy began prior to September, 1956, and continued to the date of the accident.

Crown used the building as a retail furniture store. Crown's officers were Sidney Fagelman, president; Herbert Starr, treasurer, who managed the furniture business; and Barney Fagelman (Barney), Dora's husband, clerk. Sid-

ney was Barney's son.   Herbert Starr was Barney's son-in-law.   The three men were Crown's only stockholders.

Above the basement were three floors.   "Above the third floor there was space which may be referred to as a loft but which was not intended for usual occupancy purposes." In this area, two trusses extended from the east "wall to the west wall which were intended to support the weight of the roof. . . .   The north truss was parallel to the north wall and was about 17 feet from" it.   A "substantial part of the weight of the roof rested upon the trusses which through the ends of the trusses transferred the weight to the east and west walls."

During September, 1956, a roof leak developed.   It was found that a "member" of the north truss was missing and "that . . . damage to the brick work of the east wall . . . supporting the truss was caused by effervescence and loosening of the cement joints and a settling of the roof."

Barney engaged one Archibald, a licensed builder, to make the necessary repairs.   "Archibald applied for a permit as the duly authorized representative of the owner . . . to do the work."   The Boston building code "requires that all applications for repair be signed by an authorized agent of the owner."   The city building department approved Archibald's plans.   He proceeded to replace the missing member but "failed to complete the repairs to the loose . . . mortar between the bricks, leaving it in an effervescent condition."

"On January 8, 1958, the police received notice of a dangerous condition" of the building.   The street was blocked off and Starr summoned Archibald, who "started to shore up the fractured truss . . . which had failed pushing out a bulge in the brick front" of the Meridian Street side of the building.   Under the direction of representatives of the building department, "various jacks were used to shore up the building and remove the immediate danger of collapse."

On January 8, 1958, also, "Barney . . . received and Dora . . . was informed of a notice from the [b]uilding [d]epartment that the building . . . was unsafe '. . . so

as to endanger li[f]e and . . . [was] a common nuisance
. . . .' Thereafter an application, in the name of the owner
as required by the [Boston] [b]uilding [c]ode . . . for a
permit was . . . filed by representatives of'' a wrecking
company. On January 10, a permit to ''[d]ismantle frac-
tured area of building and make safe'' was granted.[2]

Barney engaged one Rugo, a licensed engineer, to draw
plans for permanent repairs. ''Rugo, as the authorized
representative of the owner, conferred with Inspector Glea-
son and'' the building commissioner regarding the repairs
to the front wall and truss. ''[B]ecause of the dangerous
nature of the job and because of his expressed distrust of
. . . [Archibald's] qualifications,'' Gleason insisted that
Rugo sign an affidavit required by the building code (that
the plans complied with the code) ''as a condition to the
issuance of the permit.'' Rugo ''under his contract with''
Crown supervised the repairs. Archibald was low bidder.
''An application for a permit for Crown'' was filed by Rugo
to ''repair wood roof, trusses and replace front wall and
exterior walls as shown on plan.'' A permit was issued on
February 5, 1958.

On February 10 and 12, ''Gleason complained to both
Archibald and Rugo about the conduct of the work and on
February 13, 1958, he stated to Starr and Archibald that
unless conditions improved he was going to obtain a stop
order.'' Starr, who had advertised for February 22 an
''opening sale'' for Crown, was pressing ''Rugo and Archi-
bald to speed up the work and asked them both when the
jacks could be removed.'' On February 19, Gleason, ap-
parently in Starr's presence, told Rugo by telephone ''that
he, Gleason, would never personally order the jacks re-
moved'' and that this was Rugo's ''responsibility but that
even when . . . [Rugo] gave the order to remove the jacks,

---

[2] On January 20, 1958, a permit to ''repair damage and make building
safe until further work done'' was issued to Crown. The application was
signed by Archibald ''as . . . authorized representative for the owner.'' A
further permit to ''rebuild front wall'' was issued on January 23, 1958, on
an application filed by one Glazer ''as . . . authorized representative for the
owner.''

he, Gleason, forbade the removal . . . until . . . [Gleason] had examined the completed work. Gleason left the premises at about 1:45 P.M. on" February 19, when "about 70 jacks were in place." The next day "Gleason . . . [again] ordered . . . [Rugo] not to permit the removal of the jacks until after he, Gleason, had inspected the completed work." Gleason did not visit the building again until after its collapse on February 20.

"On the afternoon of February 19th, Rugo authorized the removal of all pipe jacks in the basement, first [floor] and second floor and some of the pipe jacks on the third floor which Archibald demonstrated were . . . bearing no weight." One McDonald, an employee of Crown, with a truck and helper, "removed 35 or 40 jacks from the basement, first and second floor of the building. On February 20th, he and his helper removed more jacks from the third floor." There was effort "to get the job finished." He "used a ten pound sledge hammer to knock out some of the jacks causing loose timbers over the jacks to fall to the floor." Archibald helped "with one stubborn jack." The big screw jacks under the trusses were never removed. He took "about 100 jacks to" the supplier of the jacks. When he left the building about 4:30 P.M. "about 15 pipe jacks were still in place on the third floor."

At about 4:40 P.M on February 20, 1958, the entire roof collapsed after failure of the trusses. Pressures against the walls caused the upper portions to be knocked outward. "[A]n avalanche of brick fell onto Meridian Street" and on neighboring property.

A consulting engineer testified (1) that in his opinion the cause of the collapse was the faulty design of the truss, the repairs made, and poor workmanship, (2) that if all the jacks had been left in place, the building would not have collapsed, and (3) that the wall would have collapsed whenever the jacks were removed. Gleason testified that there were three causes, including removal of the jacks. The auditor found that, among other causes of the collapse, Crown's employees, "in their haste to . . . [resume] com-

mercial use, removed . . . jacks without affording adequate opportunity for inspection," and that they "acted contrary to the advice of the" building department inspector. He concluded (1) "that there were contributing causes for which Crown, Archibald, and Rugo are answerable," (2) that Dora "had no part in the construction," and (3) that he could not find "that any other party was acting as her agent." He found generally for Dora in the actions against her.

### Louis' Alleged Conscious Suffering.

Louis, eight years old, was proceeding along Meridian Street with his friends, Richard and Lawrence Di Rocco. The auditor found that "[b]ricks from the east wall of the [b]uilding . . . knocked . . . [Louis] to the sidewalk." Although the auditor found that Louis "showed no signs of consciousness . . . after the accident," the following additional testimony was introduced at the trial. Richard Di Rocco testified that he heard Lawrence yell, "The sky is falling." The witness then proceeded, "[W]e see everything fall — we started to run to get away from it — then I got hit . . . I saw Louis fall down against the wall . . . I saw Louis getting up by putting his hands on the window sill, then first getting on to his knees and then his legs, facing the window — He turned around and started to yell, making a motion to run out toward the street, starting to yell: 'Dickie, Dickie' and then 'Ma, Ma,' and then he ran out toward the street. Bricks were falling before he got there. He kept on falling and falling until he was buried and then I didn't see anything after that."

When the police reached Louis he "was bleeding profusely from the head and mouth. He was gurgling and breathing but was unconscious." He was taken to the relief station and was dead shortly thereafter.

### Exceptions Relating to the Auditor's Report.

1. Crown and Dora contend that their constitutional rights to a jury trial were violated by submitting the audi-

tor's report to the jury. In Massachusetts, the use of auditors, whose findings are not to be final, to hear evidence in advance of a civil trial by jury in an effort to clarify the issues, has been authorized by statute since St. 1817, c. 142. The constitutional validity of the practice is established. *Holmes* v. *Hunt*, 122 Mass. 505, 516–521.[3]

The reference of issues of fact for preliminary hearing before an auditor involves no deprivation of the right to a trial by jury. At the trial before the jury, the auditor's report becomes prima facie evidence "entitled to be weighed like any other evidence upon any question of fact to which it is relevant" and otherwise has effect as more fully stated in *Cook* v. *Farm Serv. Stores, Inc.* 301 Mass. 564, 565–569.[4]

The Seventh Amendment to the Constitution of the United States does not prevent the appointment of an auditor in the Federal courts. *Ex parte Peterson*, 253 U. S. 300, 306–314. Such appointments are authorized by the Federal Rules of Civil Procedure, Rules 16 (5) and 53 (e) (III), 28 U. S. C. (1958) Appendix, pp. 5144, 5172. See Moore, Federal Practice (2d ed.) §§ 16.5, 53.01–53.10, 53.14. Rule 53 (a) provides that "the court in which any action is pending may appoint a special master therein" and that "the word 'master' includes . . . an auditor."[5]

---

[3] See G. L. (Ter. Ed.) c. 221, §§ 56–62A; Rules 86 to 88 of the Superior Court (1954), as amended. See also note to Rule 88 of the Superior Court Rules, Annotated (1932); *Cook* v. *Farm Serv. Stores, Inc.* 301 Mass. 564, 565–569. For recent cases dealing with auditors' reports and judicial scrutiny of them, see *Badoloto* v. *New York, N. H. & H. RR.* 338 Mass. 421, 424–426, 428, *Shine* v. *Campanella & Cardi Constr. Co.* 342 Mass. 150, 151–153, *Urquiza* v. *Dennis*, 344 Mass. 21, 22–24, and *Clark* v. *Turke*, 345 Mass. 516, 517–518. The practice, as will be observed from the citations above, is of much longer standing than is indicated in Moore, Federal Practice (2d ed.) § 16.15.

[4] As the *Cook* case points out (p. 567), a "finding contrary to that of the auditor" may be warranted by "evidence outside the report, introduced at the trial . . . or . . . [by] subsidiary . . . findings . . . by the auditor, from which an inference may be drawn as to an ultimate or other fact, contrary to the finding of the auditor with reference to that fact."

[5] Rule 53 (b), however, states that a "reference to a master shall be the exception and not the rule" and that in "actions to be tried by a jury, a reference shall be made only when the issues are complicated." This last provision has resulted in a more limited use (see *Burgess* v. *Williams*, 302 F. 2d 91, 93–94 [4th Cir.]) of auditors in the Federal courts than in the Massachusetts courts. Cf. *La Buy* v. *Howes Leather Co. Inc.* 352 U. S. 249, 252–254, 256–259; *In re Watkins*, 271 F. 2d 771, 775 (5th Cir.).

The due process clause of the Fourteenth Amendment does not prevent a State from adopting methods and policies of pretrial, of the use of auditors and masters, and of the conduct of civil jury trials, different from those usual in the Federal practice.[6]  Indeed, in a civil case, it has been said that even "deprivation of a right of trial by jury in a [S]tate court does not deny the parties due process of law under the Federal Constitution."  See *Wagner Elec. Mfg. Co.* v. *Lyndon,* 262 U. S. 226, 232.[7]  There is no merit to the defendants' exceptions (a) to the trial judge's refusal to strike the auditor's report in its entirety, and (b) to the reading of that report to the jury.

2.  Crown and Dora sought to strike par. 35 from the auditor's report,[8] and assert that this paragraph is unsupported by subsidiary findings and is in conflict with other findings.

The auditor's conclusion that Crown was negligent was warranted by his finding that Starr participated (in the face of Gleason's unwillingness to agree that the jacks could be removed) in removing pipe jacks before final inspection, especially from the third floor where Rugo had authorized such action only with respect to jacks bearing no weight.  The auditor in effect concluded that the work had inherent, attendant dangers, which required Crown to guard against accidents.  This conclusion was warranted

---

[6] Even in the Federal courts, "the Seventh Amendment does not exact the retention of old forms of procedure."  See *Gasoline Prod. Co. Inc.* v. *Champlin Ref. Co.* 283 U. S. 494, 498.

[7] In *Palko* v. *Connecticut,* 302 U. S. 319, 324, Mr. Justice Cardozo, speaking for the court, said of the Sixth and Seventh Amendments of the Federal Constitution, "This court has ruled that consistently with those amendments trial by jury may be modified by a [S]tate or abolished altogether."  See *Fay* v. *New York,* 332 U. S. 261, 288, 296.  See also *Balzac* v. *Porto Rico,* 258 U. S. 298, 304.

[8] Paragraph 35 reads, in part, "I find that there were separate acts of negligence on the part of Crown, Archibald and Rugo for which each is responsible; that Archibald and Rugo were both independent contractors in their relationship with Crown, but that the work for which Crown contracted had attendant dangers which Crown . . . should have recognized and was of such a nature that Crown should have known that wrongful consequences would result unless guarded against; [and] that Crown . . . not only failed . . . [to guard against the injuries and damage which resulted] but actively contributed to cause . . . [such] injuries and damage . . . ."

by the auditor's findings (a) concerning the character of the work (see *Whalen* v. *Shivek,* 326 Mass. 142, 149–153; Restatement: Torts, § 409; Restatement 2d: Torts [Tent. drafts Nos. 6 and 7, April 7, 1961, April 16, 1962], §§ 416, 422, 427, 427A), (b) that a wall bordering upon a street had to be rebuilt, (c) that there had been widespread installation of pipe jacks about which Starr certainly knew, and (d) that the building "was closed to the public during . . . repairs." There was no occasion for striking par. 35 from the report. Dora, of course, had no basis for complaint about the use of the auditor's report because the auditor's findings were wholly favorable to her.

### THE CASES AGAINST DORA FAGELMAN.

3. Dora admitted in her answer to an interrogatory that she controlled the building. She owned the building and carried insurance and paid taxes with respect to it. Nothing in the record, however, suggests that the small loft above the third floor, "not intended for usual occupancy," was not leased to Crown along with the remainder of the building under the oral lease by which Crown became responsible for all repairs.

Dora also admitted in answers to interrogatories that the city had requested repairs and that she or her agents had conferred with city representatives about the building. Some, at least, of the applications for permits were made in her name as owner. The officers of Crown were her husband, her son, and her son-in-law. She knew of the building department's notice on January 8, 1958, that the building was unsafe "and . . . a common nuisance." In the circumstances, we cannot say that there was no evidence at all upon which the jury could find that she was in control of at least the portion of the premises in which the building failure occurred.

Permit applications, signed by Rugo and Archibald as representatives of the owner, were admitted in evidence, so far as the record shows, without objection by Dora. Rugo and Archibald had been hired by the officers of Crown, who

were closely related to Dora.   The jury might reasonably infer that the applications for permits were filed by persons authorized to act for her in doing so.

We assume that, in doing the work, Rugo and Archibald were independent contractors.   The evidence warranted the jury in finding that the work undertaken was inherently dangerous (see *Whalen v. Shivek,* 326 Mass. 142, 150–151) and of a type likely to cause injury to persons using the sidewalk unless special precautions were taken.   The dangerous situation had been described as constituting a ''common nuisance'' in the building department's notice of January 8, 1958.   Under the principles stated in *Whalen* v. *Shivek,* 326 Mass. 142, 153–154, Dora could be found to be liable for any condition of the building constituting a nuisance and a source of danger to persons using the sidewalk below (a) which existed at the time of the letting to Crown under the oral lease, and (b) of which she knew or ought to have known.   Her responsibility would not end with the lease.   See Prosser, Torts (3d ed.) § 63 at pp. 414–415, § 70 at pp. 482–486.

The tenancy had ''commenced at an undetermined time prior to September, 1956,'' when trouble with the roof and truss was first discovered.   There is no evidence that the danger was known or should have been known to Dora before that discovery.   The ''oral lease,'' not shown to have been for any stated term, created at most a tenancy at will (see G. L. c. 183, § 3) terminable by notice in accordance with G. L. c. 186, § 12 (as amended through St. 1946, c. 202).

In determining whether a verdict for Dora could be directed, we must take into account, among other matters, the admissions of Dora that she controlled the premises, the rapidly terminable tenancy, the circumstance that the jury might reasonably infer the officers of Crown, Rugo, and Archibald (or some of them) to have been to some extent Dora's agents, the dangerous character of the work, and Dora's knowledge that the building had been described by the city department as a common nuisance.   In the light of all these considerations, we think that Dora was not neces-

sarily relieved, as matter of law, by the oral lease (which preceded the discovery of the defects), or by the employment of independent contractors, from a duty to take precautions against injury to members of the public. Upon the evidence the jury could conclude that Dora at least shared in the control of the building and in the obligation to take precautions. See *Grasselli Dyestuff Corp.* v. *John Campbell & Co.* 259 Mass. 103, 108–109; *Whalen* v. *Shivek,* 326 Mass. 142, 153–160; *Regan* v. *Nelson,* 345 Mass. 678, 680–681.

Although no specifically relevant exception has been claimed, one further question has been argued as bearing upon the propriety of the denial of a directed verdict for Dora. General Laws c. 229, § 2C, as amended through St. 1951, c. 250 (see later amendments, effective only after the date of the building collapse, by St. 1958, c. 238, § 3; see also c. 238, § 1, and St. 1962, c. 306, § 1), governs the recoveries for wrongful death against Crown and Dora. Where separate and independent, but concurring, acts of negligence have taken place, there may be recovery against each of two independent wrongdoers and collection by the plaintiff of amounts in the aggregate in excess of the statutory maximum. No more than that maximum, however, may be collected from any one defendant. See *Porter* v. *Sorell,* 280 Mass. 457, 459–465; *Arnold,* v. *Jacobs,* 316 Mass. 81, 84. The situation, however, is different where the liability of one defendant is based upon acts or omissions of other defendants imputed to the first defendant on agency principles. See *Leonard* v. *Lumbermens Mut. Cas. Co.* 298 Mass. 393, 394–396. Although the evidence here permits a recovery against Dora for failure to take adequate precautions to protect the public, nothing suggests that she acted or omitted to act otherwise with respect to this building than through the same persons (i.e. her husband, other close relatives, and their contractors) who acted more immediately for Crown. Crown as such does not appear to have been her agent. She, however, plainly relied on the same persons who acted for Crown, and the same acts or

omissions imputed to Crown and to her, without independent activity or participation by her, are the basis of the recovery against Crown and against her. The situation seems to us to be covered by the reasoning in the *Leonard* case, so that no more than $18,000 (plus interest and costs) may be collected from Crown and no more than $16,000 (plus interest and costs) may be collected from Dora, and amounts collected from one (other than for costs) must be credited against the liability of the other, in accordance with the principles stated in the *Leonard* case.

### THE COUNTS FOR LOUIS' CONSCIOUS SUFFERING.

4. Although Richard Di Rocco "got hit" before Louis fell, the evidence at the trial before the jury does not establish whether Louis was hit by a brick prior to his falling to the ground "against the wall," or whether he merely stumbled. There is in that evidence no direct statement that bricks struck him before "he ran out toward the street," although it is said that "[b]ricks were falling before he got there." There is no evidence which would warrant a finding of conscious suffering after that moment. The auditor found that bricks knocked Louis to the sidewalk and that he showed no signs of consciousness after the accident. On either the evidence at the trial or on the auditor's report, whether there was any conscious suffering at any time is a matter of sheer speculation. *Ghiz* v. *Wantman,* 337 Mass. 415, 419–420, and cases cited. See *Royal Indem. Co.* v. *Pittsfield Elec. Co.* 293 Mass. 4, 8–9; *Carr* v. *Arthur D. Little, Inc.* 348 Mass. 469, 474–478. Cf. *Isaacson* v. *Boston, Worcester & N. Y. St. Ry.* 278 Mass. 378, 391–392; *Campbell* v. *Romanos,* 346 Mass. 361, 367. There was no error in directing verdicts for the defendants on the counts for Louis' alleged conscious suffering.

*Exceptions overruled.*