Heng Or, administrator,[1] *vs.* Lawrence C. Edwards,
individually and as trustee, & another.[2]

No. 02-P-1304.

Suffolk. December 10, 2003. - November 19, 2004.

Present: Gelinas, Kaplan, & Cohen, JJ.

*Negligence,* Employer, Entrustment, Causation, Proximate cause, Foreseeabil-
ity of harm, Wrongful death. *Jury and Jurors. Conscious Pain and
Suffering.*

In a wrongful death action brought by a father on behalf of his minor daughter,
alleging that the negligent conduct of the defendant landlords in hiring or
retaining an unfit person as a custodian and entrusting him indiscriminately
with the keys to the landlords' apartments (including one in which the
father and his daughter were tenants) resulted in the murder of his daughter
by the custodian, the trial judge correctly denied the defendants' motion
for judgment notwithstanding the verdict, where the jury could find with
the required probability that the defendants, with their knowledge of the
custodian (i.e., that he was a jobless, homeless drifter with a drinking
problem and a criminal record that required him to appear repeatedly in
court and to submit to a mental competency examination) and what the
landlords would have learned upon simple inquiry among those who knew
the defendant, were negligent in entrusting the keys to such a person
[482-485]; and where the entrustment of the keys to the custodian both
factually [485] and proximately caused the wrongful death, as the jury
could find it was within the range of reasonable foreseeability that the
landlords' failure to make due inquiries about the unfit custodian, especially
when combined with entrusting him with the keys, created a likelihood of
types of harm to others of which one came about in the custodian's violent
attack on the decedent [485-491].

In an action brought by a father on behalf of his deceased minor daughter,
seeking damages for her wrongful death and for her related conscious pain
and suffering, the trial judge properly allowed the defendants' motion for
judgment notwithstanding the verdict on the pain and suffering claim,
where the father failed to demonstrate, as required by G. L. c. 266, § 6,
conscious suffering by cognizable proof beyond mere surmise. [491-493]

---

[1]Heng Or is administrator of the estate of Anmorian Or.

[2]Florence P. Edwards, individually and as trustee. Both defendants are
trustees of the Shirley Realty Trust, the Edwards Family Trust, and the Hich-
born Realty Trust.

CIVIL ACTION commenced in the Superior Court Department on July 21, 1992.

The case was tried before Catherine A. White, J., and a motion for a new trial was heard by her.

*Paul L. Lees* (*Jacqueline V. Lees* with him) for the plaintiff.

*Michael P. Sams* (*Christopher A. Kenney* with him) for the defendants.

KAPLAN, J. The plaintiff Heng Or, administrator of the estate of his young daughter Anmorian Or, seeks damages for her wrongful death, G. L. c. 229, § 2, and for her related conscious pain and suffering, G. L. c. 229, § 6, claiming these harms were brought about through the defendant landlords' negligence in hiring or retaining an unfit person for a custodial entrustment. After trial, the jury found for the plaintiff for the wrongful death in the amount of $1.6 million and $2.75 million for conscious pain and suffering. Upon the defendants' motions for judgment n.o.v. or a new trial, a judge of the Superior Court denied the motions as applied to the verdict for the wrongful death (remittitur being also denied), but allowed the motion for judgment as to conscious pain and suffering. The defendants appeal from the judgment entered upon the jury's verdict for the plaintiff for wrongful death. The plaintiff appeals from the judgment for the defendants as to conscious pain and suffering.

## WRONGFUL DEATH

The theme of the action is that the defendant landlords, charged with exercising reasonable care for the protection of occupants of the premises, acted negligently in selecting an unfit person (Vao Sok) for custodial duty and entrusting him indiscriminately with the keys to apartments, thereby initiating a foreseeable likelihood of harm to others. In the event, this negligent conduct on the defendants' part resulted in harm (murder of the child Anmorian) corresponding in a general sense with one or more of the foreseeable harms. For such injury, the defendants were fairly found by the jury to be accountable.

*Narrative.* 1. Eng Ros lived with her husband, Heng Or, and their three children, Anthony, aged six, Anmorian, five, and Jimmy, three, in apartment no. 2 on the first floor of the twelve-

apartment building at 146 Shirley Avenue, in a blighted neighborhood of Revere. About 5:30 A.M., Friday, May 15, 1992, Eng Ros arose to care for the children, then drove the two older children to the Garfield School in Revere. Around 11:00 A.M. she retrieved them and, returning home, reclothed and fed all three children. She took a nap, entrusting the children to her mother, Nay Tuch, who lived in apartment no. 4 on the second floor. When Eng Ros awoke, around 2 P.M., Anmorian was not on hand. Eng Ros told her mother to look for Anmorian; at that point Eng Ros had to prepare and drive to her job on a 3:00-11:00 P.M. shift in Salem.

While at work, about 4:00-5:00 P.M., Eng Ros received a telephone call from her friend Soy May — Anmorian was still missing. Alarmed, Eng Ros left work and drove to Heng Or's workplace in Lynn (he was on a day shift). They returned in their separate cars to 146 Shirley Avenue and began a search inside and outside the building. Heng Or found a police officer on the avenue, and, after producing at the officer's request a picture of Anmorian, he entered the officer's car and they cruised the nearby streets without result.

Sometime between 6:00 and 8:00 P.M. Heng Or made a canvass of most of the apartments in the building, knocking on the doors and inquiring of any who answered, and trying the handles of doors where there was no response. The account we have of this search is not complete, but it is reported that Heng Or found apartments no. 3 and 3A on the first floor — no. 3A being opposite no. 2 — unresponsive to knocks and unyielding at the door handles. Toward evening, Heng Or called Lawrence Edwards at his business office on Hichborn Street[3] and left a message on the answering machine. In one version of the message Heng Or asked Edwards' help to gain entry to the locked apartments.

After little or no sleep, Heng Or on Saturday morning resumed search and worry without any specific plan.[4] On Shirley Avenue he ran into relatives, Hun Hoy and Buon Men. After conversation about the futile search so far, the relatives sug-

---

[3]Edwards shared the office with his son Peter, a master locksmith.

[4]Heng Or went to see his supervisor about 6:00 A.M. Saturday to explain the situation and seek advice. Returning to 146 Shirley around 6:15 A.M., Heng Or

gested that Heng Or try the apartments again. About 1:00-2:00 P.M. Heng Or was rechecking the doors of apartments 3 and 3A. Unexpectedly the door of no. 3A opened. The apartment appeared used in part at least for storage. Heng Or entered the bedroom. Anmorian was lying on the floor, on her back, clothed, with her legs bent at the knees. As Heng Or clasped her, he saw her eyes rolling without a sign of recognition. She was making a "tiny" sound. She was taken to the Massachusetts General Hospital, where she died on May 19, a brain death from asphyxiation.[5]

2. It is likely, though we are not told, that Vao Sok, twenty-three years old, used by Lawrence Edwards to do handyman's work about the building, came first under suspicion for homicide because he possessed a key to apartment no. 3A. On May 21, he told the police what he had done, recorded in a statement in the Khmer language signed by him, of which we have a translation, and again in questions and answers in English, a translation from the Khmer. According to his confession, Vao Sok on the morning of May 15 went to Syria Market where he was given a cup of wine and bought two forty-ounce bottles of beer. Then he bought one hundred dollars' worth of cocaine and smoked it to the end with his friend Mey in the vacant apartment no. 9 upstairs on the third floor. He bought $200 more, and resumed smoking with Mey. All that morning, Vao Sok said, he drank wine and a great deal of beer and smoked cocaine and marijuana. He met the little girl in the hallway of the entrance to 146 Shirley. He was mad because (like others he solicited) she wouldn't give him money for cocaine. Asked by police why he first hit the girl, Vao Sok said, "Because I said I need money to buy cocaine to smoke. Even though the adult people I would hit too." Complaining of drink-blurred memory, he said he hit her unconscious, he squeezed her mouth and throat, he dragged her into no. 3A, which he opened with his key to a lock in the door handle. He dropped her near the wall. He was so drunk he didn't remember whether he raped her (the

---

encountered Vao Sok standing outside. Sok asked, "Can you find your daughter?" Heng Or answered he could not.

[5]The death certificate cites the cause of death as "obstruction of airway by another person" (anoxic encephalopathy and asphyxia, each with an interval of four days, May 15-May 19, between onset and death).

doctors later confirmed that he had done so). He left no. 3A in a hurry, and just slammed the door shut, he wanted to get outside and drink beer with the other young men.[6]

3. Lawrence Edwards, owner and landlord (with his wife Florence Edwards) of 146 Shirley Avenue, took care himself of repair and maintenance tasks there. A tenant, Map Sem, occupying no. 7 on the second floor, introduced Vao Sok to Edwards as "my friend Van" and suggested Vao Sok could help him in his work. According to the best guess of Edwards and Map Sem, this was in July, 1991, some ten months before the fatal incident. Edwards learned after meeting Vao Sok that he was staying as a nonpaying boarder on the kitchen floor of Map Sem's apartment.[7] Edwards would see Vao Sok around the place "almost daily" and would communicate with him in English. Edwards would not arrange with Vao Sok in advance to do given jobs, but if Vao Sok was on the premises when a need arose, Edwards might call on him and would pay him five or ten dollars for his help. Thus Vao Sok helped from time to time with painting and cleaning, moving barrels, etc.

In the early months of 1992, 146 Shirley was being "deleaded" as required by law. To allow the deleaders to come in and do their work, tenants moved from their regular apartments to vacant (untenanted) apartments; Edwards would clean and perhaps redecorate as the deleaders completed their work and before the tenants moved back to their own apartments. Edwards thought six out of twelve apartments were vacant on May 15; these would be in various conditions and contain supplies of sundry sorts.

Edwards was anxious that no vacant apartment should be left unlocked and open. Especially as entry into the building was not guarded, to leave a vacant apartment open invited theft of

---

[6]Vao Sok was tried and on October 1, 1998, convicted of the kidnapping, rape, and murder of Anmorian. On appeal the kidnapping conviction was vacated as duplicative of the felony murder conviction; the other convictions were affirmed. *Commonwealth* v. *Vao Sok,* 435 Mass. 743, 758-759 (2002).

The present action was filed on July 21, 1992. On motion of the district attorney, trial was put off until completion of the murder trial, and occurred on November 28, 2000.

[7]This was in violation of the landlords' standard lease with Map Sem, but Edwards took no action.

the contents or other illicit uses. To assure that no vacant apartment would be left in this naked condition, Edwards gave the keys to these apartments (including the keys to nos. 3A and 9) to Vao Sok, evidently with instructions about keeping the apartments locked when not being utilized for the deleading routine. (There is no indication that Vao Sok was paid anything for this particular duty.) Vao Sok kept the keys in his possession over a period of time without being asked to surrender them. As far as appears, Edwards kept no account of the keys. It should not be overlooked that the keys to vacant apartments also gave entry to the apartments after they were reoccupied by tenants following the deleading.

Edwards testified he worked at 146 Shirley until about noon on May 15, left for lunch and returned at 1:00 or 1:30, and left for good around 4:00 P.M. In the morning he worked in apartments nos. 3 and 9; he does not recall any unusual smell in no. 9, but he says he has no acquaintance with the odor of smoked cocaine. Edwards worked in no. 3 (adjacent to no. 3A) in the afternoon but heard nothing exceptional. Leaving the building, he passed Vao Sok and some two to five other men outside drinking beer. Edwards told Vao Sok not to drink beer in public. Vao Sok answered (paraphrased), "I'm drinking."[8]

Heng Or's telephone call in the evening of May 15 would have sounded at the Edwards home as well as the office, but was recorded only at the office. The Edwards couple were at their son's house for dinner (it was Lawrence Edwards' sixty-second birthday); in any event the telephone call was not heard. Edwards was uncertain whether he learned of the assault on the child on Saturday or Sunday. The telephone record was played and erased on Monday, May 18.

4. Edwards knew Vao Sok as "Van." Because Vao Sok was not a paying tenant, Edwards never checked his credit record or

[8]One Joseph T. James, with his wife, was near the Shirley Avenue address on May 15 between noon and 1:30 P.M. He saw a small girl, identified as Anmorian, skipping in front of the building. An "Asian" man was also there. Vao Sok was one of the three men James selected from photographs as closely resembling the Asian man Jones saw. This man had a can in his hand. He was "acting a little obnoxious. . . . He was going out speaking to people on the street whether he knew them or not, I don't know. And they kind of shrugged [him] off and went their way."

secured other information demanded of tenants. Nor did Edwards ask Vao Sok to fill out an employment application or provide background information such as residences, employers, or named references. At no time did Edwards inquire from any person or other source about Vao Sok his ability, behavior, character, record, or any other dimension. Edwards, however, told police Captain William Gannon he learned from Vao Sok that he faced criminal charges for stealing a friend's car (but it was, said Vao Sok, a false charge). Vao Sok told Edwards he could not work on particular days because he had to report to court in Salem. Vao Sok also told Edwards he had to report on "probation," and he had spent time in a hospital for observation (which Edwards took to mean mental observation). There is no proof of any theft charge against Vao Sok. In fact, Vao Sok had been indicted in Essex Superior Court in Salem in 1990 for kidnapping and raping a young girl, and was let out on cash bail of $2,500.[9] The prosecution moved slowly and trial did not occur until August, 1994, when Vao Sok was acquitted. In connection with this Essex prosecution, Vao Sok did spend time at Bridgewater State Hospital in April-May, 1991, being examined regarding his competence to stand trial. After an initial impression that Vao Sok had an "adjustment disorder with mixed emotional features," he was diagnosed as having no major mental disorder and not in need of psychiatric hospitalization, and declared competent to stand trial. It is suggested that Vao Sok tried to relate the hospitalization and "probation" to a fictitious theft charge in order to obscure their relation to the Essex prosecution.[10]

Sergeant Detective Steven Pisano, interviewing Vao Sok on Sunday, May 17, drew from him that he drank regularly and heavily; indeed he was drunk the day before the interview. Map

---

[9]We infer bail was terminated after the May 15, 1992, incident.

[10]Notice of Vao Sok's arrest in the Essex prosecution appeared in May 1990 in two local papers to which Edwards subscribed the police blotter of the Revere Journal and an article in the Lynn Item on the unusual occurrence of two child molestation cases in a single weekend. According to the latter article, Vao Sok (then of Malden) was accused of luring three girls from an elementary school into his car giving two of them money to get out and buy ice cream, driving off with the third, and raping her in his home.

Edwards denied knowledge or recollection of these newspaper stories.

Sem, interviewed about Vao Sok, confirmed the drinking and said when Vao Sok was in that condition while hanging out in front of the building he was hard to control, acted crazy, wouldn't stop, yelled at girls; Map Sem became fearful of him. Map Sem said his wife, Hem Beng, told him Vao Sok had been "inappropriate" or "impolite" toward her. Hem Beng herself testified she had not left the children alone with Vao Sok. Map Sem concurred that with Vao Sok about the apartment he was concerned for his family when he left for work. Hem Beng wanted to kick Vao Sok out of the apartment — he drank and smoked and had no job but he begged to stay. On May 15 at about 4 P.M. she saw a very drunk Vao Sok outside the building.

*Elements of the tort.* 1. *Negligence.* Could a jury find with the required probability it was a negligent act on Edwards' part to entrust the mission of a custodian and possession of the keys to Vao Sok, thereby allowing him access at all hours to apartments vacant or occupied?

There was no occasion for particular worry about Vao Sok's fitness as long as Edwards used him for handyman jobs that involved little if any contact with other people. Concern should have arisen when Edwards was at the point of handing the keys to Vao Sok, and Edwards' indifference and inaction at that stage has the look of a bad mistake. The change of function and the entrustment of keys prepared the stage for trouble; see the similar situation in *Williams* v. *Feather Sound, Inc.,* 386 So. 2d 1238, 1239, 1240 (Fla. Dist. Ct. App. 1980). See also *Tallahassee Furniture Co.* v. *Harrison,* 583 So. 2d 744, 748-749 (Fla. Dist. Ct. App. 1991).

At that moment before entrustment, Edwards through his acquaintance with Vao Sok (and others) over time can be taken to have recognized Vao Sok as a jobless, homeless drifter with an alcohol addiction probably compounded by a drug habit, raising a question by what tactics not excepting force he could manage to support such indulgence. Edwards understood from what Vao Sok had himself vouchsafed that he was charged with a criminal offense described rather indefinitely and dismissively as a car theft, but somehow involving a requirement that he appear repeatedly in court, submit to examination in a hospital for mental competency, and attend to "probation" (undetailed).

Even on this brief picture, Edwards with ordinary caution might well have abandoned on the spot any thought of passing the keys to Vao Sok and looked elsewhere for a reliable custodian.

Surely Edwards was at least put on notice, and might have taken the prudential step of inquiring further about Vao Sok. Recalling what Map Sem and Hem Beng told the officers, one might have expected Edwards to draw from these rather overtaxed friends the facts not only of Vao Sok's heavy drinking and smoking, but of his penchant for uncontrollable temper when drunk. So also these friends might have attested to their fear for their children when Vao Sok was present. Finally, would not caution have called for a follow-up on the self-reported hints of Vao Sok's entanglements with crime? The record goes far enough to establish that from June 27, 1990, and onward through the time Edwards entrusted him with the keys, Vao Sok stood accused by indictment of kidnapping and raping a young girl. A jury might reasonably infer Edwards could have learned that fact upon simple inquiry among those who knew Vao Sok, quite apart from any permissible resort to official documents. In the normal reaction of one seeking a fit person for an entrustment, the fact of the indictment would go far to clinch the matter against choosing the accused. It can hardly count as a factor in considering Edwards' negligence that Vao Sok was acquitted of the Essex charges upon trial two years after the happening of the crime against Anmorian at bar here (any more than it could count that he was convicted of the crimes against Anmorian six years later).[11]

Negligence in hiring or retaining a person to perform given tasks who is unfit for the job was long ago recognized as a ground of liability for the harmful effects of the choice upon related persons. In *Carson* v. *Canning*, 180 Mass. 461, 462 (1902), Holmes, C.J., said, "The plaintiff [who had pledged goods with the defendant pawnbroker] was allowed to recover on the ground that the absconding manager was an unfit man for his trust, and that the defendant could and would have found

---

[11]Arrest and indictment do not bear on guilt but do bear on one's judgment in selecting a custodian where doubt should be resolved against a candidate. See *Easley* v. *Apollo Detective Agency, Inc.*, 69 Ill. App. 3d 920, 934-936 (1979); *Tallahassee Furniture Co.* v. *Harrison*, 583 So. 2d at 760.

out if he had used ordinary care."[12] See also *Foster* v. *The Loft, Inc.*, 26 Mass. App. Ct. 289, 290 (1988), see 403 Mass. 1103 (1988) (case settled). It would not avert liability that the absconder was committing a crime, for "liability may be imposed if a defendant negligently fail[s] to guard against the consequences of reasonably foreseeable criminal conduct [of a third person such as the absconder]." *Poskus* v. *Lombardo's of Randolph, Inc.*, 423 Mass. 637, 639 (1996).[13] See *Copithorne* v. *Framingham Union Hosp.*, 401 Mass. 860, 865 (1988); Restatement (Second) of Torts § 449 (1965); Annot., 43 A.L.R. 3d 331 (1972).

Edwards' fault of negligence in the sense of the *Carson* case is exacerbated by the fact that, as landlord of residential property in this neighborhood, he was under a duty — higher than that of a commercial landlord, see *Whittaker* v. *Saraceno*, 418 Mass. 196, 197 (1994) — to protect tenants from reasonably foreseeable risks of harm,[14] including foreseeable risks of criminal acts. See *Griffiths* v. *Campbell*, 425 Mass. 31, 34 (1997). See also *Poskus* v. *Lombardo's of Randolph, Inc.*, 423 Mass. at 639-640;

[12]The theory of negligent hiring or retention acknowledged in the *Carson* case is distinct and different from the theory of respondeat superior. See *Ponticas* v. *K.M.S. Investments*, 331 N.W. 2d 907, 910-911 & n.5 (Minn. 1983). Cf. *Costos* v. *Coconut Island Corp.*, 137 F.3d 46, 50 (1st Cir. 1998). The former theory has been applied extensively in recent years and appears in many passkey and other cases cited under "Limitation on liability," *infra.*

[13]The reference to reasonable foreseeability as quoted from the *Poskus* case prompts us to note, as well brought out in the projected Restatement (Third) of Torts, that foreseeability enters into a consideration of whether an actor has been negligent: a "[p]rimary factor[] to consider in ascertaining whether the person's conduct lacks reasonable care [is] the foreseeable likelihood that it will result in harm . . . ." Restatement (Third) of Torts: Liability for Physical Harm (Basic Principles) § 3 (defining "negligence") (Tentative Draft No. 1, 2001), and see comment g thereon. Foreseeability also appears as a factor in the "Limitation on liability" for the consequences of the negligent act (customarily referred to as "proximate cause"), considered *infra.* See the recognition of the double relevance in *Whittaker* v. *Saraceno*, 418 Mass. 196, 198-199 (1994).

[14]The court in *Whittaker* cites as comparable relationships those between a college and its students, *Mullins* v. *Pine Manor College*, 389 Mass. 47, 54-55 (1983), a common carrier and its passengers, *Sharpe* v. *Peter Pan Bus Lines, Inc.*, 401 Mass. 788, 791-792 (1988), and a hotel and its guests, *Fund* v. *Hotel Lenox of Boston, Inc.*, 418 Mass. 191, 192 (1994). See Restatement (Second) of Torts § 314A (1965).

Restatement (Second) of Torts § 449.[15] Edwards' negligence is further worsened by what common sense as well as numerous judicial opinions tell us about the foolhardiness of offering the temptations and opportunities of a loose passkey (plural keys in the present case were an equivalent) to an unfit person. See *D.R.R* v. *English Enterprises*, 356 N.W. 2d 580, 584 (Iowa Ct. App. 1989); *Knapp* v. *Wilson*, 535 S.W. 2d 369, 370 (Tex. Civ. App. 1976).

2. *Factual cause.* Assuming negligence, next is the question whether a jury could find that the entrustment of the keys in relation to the custodial task was as a matter of fact a substantial causative factor in bringing about the wrongful death. The question can be recast in "but-for" terms without change in meaning or likely result. See Restatement (Second) of Torts §§ 431, 432 & comment a.[16]   There may be argument that Vao Sok would have committed the rape and murder even if he did not have stealth and concealment available to him by means of the keys, and speculation to that end cannot be dismissed as irrelevant. Yet the record allows an inference that the acts causing asphyxiation of the victim were inflicted within apartment 3A, as the rape surely was. Suppose those acts were committed outside no. 3A; still they could have been encouraged by the nearness of no. 3A for the cover there provided. Remove from the scene the key that opens the door to no. 3A: commission of the crimes becomes more precarious, less tempting for the perpetrator. Factual cause appears not seriously contested on the appeal.

3. *Limitation on liability.* (a) *Customary formulation.* Negligent actors in innumerable contexts are not to be held to account for all the consequences of their delicts however remote;

[15]Here we have spelled out Edwards' tort as negligent hiring, aggravated by breach of the landlord's duty of care toward occupants, especially in a residential locus. The tort may be formulated alternatively as breach of the landlord's duty of care by reason of the negligent hiring. Cf. *Tenney* v. *Atlantic Assocs.*, 594 N.W. 2d 11, 14-17 (Iowa 1999); *Shepard* v. *Drucker & Falk*, 63 N.C. App. 667, 669-670 (1983). The trial judge touched on both formulations in her instructions and memorandum of decision.

[16]The projected Restatement (Third) of Torts prefers the but-for formulation and also urges the use of "factual cause" as a clean category disentangled from such expressions as "legal cause." See Restatement (Third) of Torts § 26 & comments a & b (Tentative Draft No. 2, 2002).

a sense of due proportion between the fault and the compensation to be exacted, together with pragmatic social considerations, call for reasonable limits or boundaries on the liability. These have been expressed in terms of so-called "proximate cause" which turns on foreseeability. The customary instruction to a jury says in effect that the defendant is responsible for the harms caused in substantial degree by the negligent act, except any so highly extraordinary that the defendant could not ex ante have reasonably foreseen that the negligent act would bring them about.[17] The judge charged on these lines.

Thus the jury tries to reproduce the picture of what a reasonable person, as of the moment before the negligent act, would have foreseen as the likely harmful consequences of that act; alongside this picture the jury is to set the picture of the actual happening, and then to observe, in a general sense,[18] how far the harm in fact experienced resembles any of the harms reasonably to have been foreseen. See Restatement (Second) of Torts § 435 & comment b. In Holmes's absconder's case, the pictures are narrow and the harm foreseen and harm suffered are much alike; the same often is true in physical accidents, and liability follows. Then take cases of the negligent hiring of persons unfit to be entrusted with passkeys. Here the initial picture may be broad, there may be multiple foreseeable harms reflecting the various opportunities that lie open for erratic or intentional behavior with resulting harms. The harm actually experienced may resemble one or other of those reasonably foreseen, with liability following — or may stand altogether apart.

(b) *Possible reformulation.* The projected Restatement (Third)

---

[17]Restatement (Second) of Torts § 435(2) indicates that the "extraordinariness" might be judged retrospectively: "where after the event and looking back from the harm to the actor's negligent conduct, it appears . . . highly extraordinary that it should have brought about the harm." But in practice the reference is to *fore*sight. Compare § 435 comment b. Judge Posner remarks: "A person is not liable for such improbable consequences of negligent activity as could hardly figure in his deciding how careful he should be. Liability in such circumstances would serve no deterrent, no regulatory purpose; it would not alter behavior or increase safety." *Jutzi-Johnson* v. *United States*, 263 F. 3d 753, 756 (7th Cir. 2001).

[18]The decisions repeat endlessly that to be actionable the harm experienced need not resemble the harm foreseen with any exactness of extent or manner of occurrence. See *Flood* v. *Southland Corp.*, 416 Mass. 62, 71-73 (1993). Compare *Hebert* v. *Enos*, 60 Mass. App. Ct. 817, 821-822 (2004).

of Torts (referred to at notes 12 & 15, *supra*) offers a parallel felicitous statement of the foreseeability proposition that harks back to *Marshall* v. *Nugent*, 222 F.2d 604, 610 (1st Cir. 1955), where Magruder, C.J., wrote:

> "[S]peaking in general terms, the effort of the courts has been, in the development of this doctrine of proximate causation, to confine the liability of a negligent actor to those harmful consequences which result from the operation of the risk, or of a risk, *the foreseeability of which rendered the defendant's conduct negligent.*"

The judge added a caveat regarding flexibility of definition:

> "Of course, putting the inquiry in these terms does not furnish a formula which automatically decides each of an infinite variety of cases. Flexibility is still preserved by the further need of defining the risk, or risks, *either narrowly, or more broadly*, as seems appropriate and just in the special type of case." (Emphases supplied.)[19]

Just so, Tentative Draft No. 2 (2002) of the Restatement (Third) of Torts adopts a formulation in negative style:

> "§ 29. Limitations on Liability for Tortious Conduct. An actor is not liable for a harm different from the harms whose risks made the actor's conduct tortious."

The use of "risk," rather than "reasonable foreseeability," to define the limitation on liability seems to assist analysis as it sheds confusing terminology often found in discussions of "proximate cause" and neatly exhibits the relationship between negligence as defined in § 3 of the Restatement (Third) of Torts (Tentative Draft No. 1, 2001), see note 13, *supra*, with scope of liability under § 29. The new dispensation is not aimed intrinsically at different practical results from the old, for reasonable foreseeability dominates § 29 by its reference to the "tortious" (i.e. negligent) character of the initial act. See comment j to § 29.

(c) *Case law*. Consistently with the trial judge's conventional

---

[19]Judge Keeton's monograph, Legal Cause in the Law of Torts (1963), developed a similar thesis with much force.

charge on "proximate cause," the jury could find it was within the range of reasonable foreseeability that the defendants' failing to make due inquiries about the unfit Vao Sok, especially as combined with entrusting him with mission and keys,[20] created a likelihood of types of harm to others of which one came about in Vao Sok's violent attack on Anmorian: thus the defendants are accountable. Restated according to § 29 of the Restatement (Third) of Torts (Tentative Draft No. 2) — the defendants are held liable as the harm that eventuated was among the (foreseeable) harms that made the failure to inquire tortious (negligent).

The present case resembles *Ponticas* v. *K.M.S. Investments,* 331 N.W. 2d 907 (Minn. 1983), an often-cited leading case in the application of the tort of negligent hiring or retention. The defendant landlord in *Ponticas* hired one Graffice as apartment manager of a residential complex. Reasonable inquiry would have disclosed Graffice's shady background with criminal history, but only a limited, hurried investigation was undertaken. With the use of a passkey, incident to the job, Graffice entered a tenant's (the plaintiff's) apartment and raped the tenant there. The court speaks of the nature of the tort. As to inquiries about candidates for given jobs, "[t]he scope of the [prudent] investigation is directly related to the severity of risk third parties are subjected to by an incompetent employee"; entrustment of passkey figures in considering the "scope." *Id.* at 913. How far criminal history or other past misbehavior should serve to disqualify a person may turn on the character of a particular intended employment. The court examines the causal relation between the negligent omission to inquire and the ultimate harm, as well as "proximate cause" in the usual formulation. It has no difficulty in affirming the jury's findings for the plaintiff.

Cited in the margin are illustrative cases like *Ponticas* and the present case portending liability for negligence in hiring an unfit person and allowing a loose passkey, all resulting in harm reasonably foreseeable from the start.[21] Other cases reach like

---

[20]The passkey or equivalent tends both to increase the likelihood that harm will occur and to facilitate the happening.

[21]See *Kendall* v. *Gore Properties, Inc.,* 236 F.2d 673, 675, 678-682 (D.C. Cir. 1956); Knerr *vs.* Gilpin, Van Trump & Montgomery, Inc., C.A. No. 85C-

results on similar facts but not including the passkey factor.[22] Still other cases ground liability simply on the defendant's (landlord's) lack of due care in controlling the availability of passkeys.[23] Finally, the type of employment or status of the person negligently employed may give opportunity and entry similar to those provided by a passkey — take the instance of a door-to-door salesman of a standard item, a vacuum cleaner.[24]

A dissenting opinion of Daughtrey, J. (voting to reverse a summary judgment for the defendants) in *Doe* v. *Linder Constr. Co.*, 845 S.W. 2d 173, 184 (Tenn. 1992), has a useful review of negligent handling of passkeys, negligent hiring, and other matters. See also discussion in *Doe* v. *Dominion Bank of Washington, N.A.*, 963 F.2d 1552 (D.C. Cir. 1992).

The defendants' cited cases do not come near the circumstances of the present case which raise propositions of landlord's negligence in hiring and breach of a duty of care for tenants. In *Coughlin* v. *Titus & Bean Graphics, Inc.*, 54 Mass. App. Ct.

JL-71 (Del. Super. April 8, 1988); *Williams* v. *Feather Sound, Inc.*, 386 So. 2d at 1239, 1240-1241; *Easley* v. *Apollo Detective Agency, Inc.*, 69 Ill. App. 3d at 923-926, 931-932; *D.R.R.* v. *English Enterprises*, 356 N.W. 2d 580, 583-584 (Iowa Ct. App. 1984); *J.* v. *Victory Tabernacle Baptist Church*, 236 Va. 206, 207, 211 (1988). Cf. *Southeast Apts. Mgmt., Inc.* v. *Jackman*, 257 Va. 256 (1999).

[22]See *Tallahassee Furniture Co.* v. *Harrison*, 583 So. 2d at 748-751; *Yunker* v. *Honeywell, Inc.*, 496 N.W. 2d 419, 420-424 (Minn. Ct. App 1993). See also *Malorney* v. *B & L Motor Freight, Inc.*, 146 Ill. App. 3d 265, 266-267 (1986). Cf. *Island City Flying Serv.* v. *General Elec. Credit Corp.*, 585 So. 2d 274, 274-275, 277 (Fla. 1991).

[23]See *Smith* v. *General Apt. Co.*, 133 Ga. App. 927 (1975); *Rowe* v. *State Bank of Lombard*, 125 Ill. 2d 203, 221-224, 228 (1988) (reversing summary judgment entered for defendants), same case after remand and trial, 247 Ill. App. 3d 686, 688-689 (1993); *Danile* v. *Oak Park Arms Hotel, Inc.*, 55 Ill. App. 2d 2, 6 (1964); *Center Mgmt. Corp.* v. *Bowman*, 526 N.E. 2d 228 (Ind. Ct. App. 1988); *Presley* v. *Smith*, 527 So. 2d 1095, 1098-1099 (La. Ct. App. 1988); *Doe* v. *Stegall*, 757 So. 2d 201, 206 (Miss. 2000); *Dollison* v. *Mercy Servs. Corp.*, 7 Neb. App. 555, 560-561 (1998); Kerlin *vs.* Standard Invs. Co., 1983 Okla. Civ. App. Lexis 138, at*2, 5-6 (May 10, 1983). Cf. McDermott *vs.* Midland Mgmt., Inc., 997 F.2d 768, 769, 771 (10th Cir. 1993) (manager let in person who assaulted tenant). But cf. *Knapp* v. *Wilson*, 535 S.W. 2d 369, 370-371 (Tex. Civ. App. 1976) (landlords had duty to maintain proper control of apartment keys and master keys, but cause of burglary not sufficiently shown).

[24]See *McLean* v. *Kirby Co.*, 490 N.W. 2d 229, 232-235 (N.D. 1992). Cf. *Kendall* v. *Gore Properties, Inc.*, 236 F.2d 673, 675-681 (D.C. Cir. 1956); *Tallahassee Furniture Co.* v. *Harrison*, 583 So. 2d at 747-749.

633, 637-641 (2002), the defendant employer knew the man it hired, now on parole, had served time for a serious offense. The defendant assigned him to work in a largely empty warehouse where his contact with others would be minimal. With a key to the warehouse the man lured a woman, a casual passerby, inside and murdered her. A background check of the man, had it been done, would have shown that his release on parole was based on professional evaluations that he was no longer a sexually dangerous person. The defendant employer denied giving him a key and there was no evidence as to how he had obtained it. There was no tenable claim on behalf of an unrelated member of the public against this defendant, who could point to the expert opinions and had used caution in placing the man for work. The forseeability factor was indeed weak. In the present case, Edwards' whole body of information, actual and imputed, was of a different order, supporting rather than challenging the jury's verdict. In *Griffiths* v. *Campbell*, 425 Mass. 31 (1997), the defendant landlord did not inform the police that an apartment was being used as a drug den and the door was partly barricaded. The shooting death of a police officer during a drug raid could hardly figure in the range of foreseeable risks; indeed the landlord's omissions were not operative as a but-for cause.

*Issues for the jury.* Each element of the tort presents itself normally as an issue of fact; there is proper reluctance to withdraw the issue from the jury or to nullify the jury's finding and, as the court noted in *Foley* v. *Boston Hous. Authy.*, 407 Mass. 640, 646 (1990), such invasion of the jury's function is justifiably "rare." Juries have a special place and value when it comes to handling the issue of limitation on liability, for here community standards — conceptions about what is right —should and inevitably do play their part. This is what Magruder was alluding to when he wrote of defining the risks "either narrowly, or more broadly." And so the court in the *Whittaker* case, 418 Mass. at 198[25]: "Notions about what should be foreseen . . . . are very much interwoven with our feelings about fair and just limits to legal responsibility." Professor Kenneth Abraham says, "Far from being the theoretical and

[25]Adopting the statement at 4 Harper, James, & Gray, Torts § 20.5, at 136-137 (2d ed. 1986).

conceptual construct that the appellate decisions sometimes make it seem to be, in this sense [of invoking the jury's view of things] proximate cause is the most practical and realistic of doctrines, for it asks the jury to step back after it has applied the individual pieces of the liability puzzle and look at the whole picture before it makes the final decision." Abraham, The Forms and Functions of Tort Law 135 (1997).

To conclude: As to wrongful death, the defendant's motion for judgment n.o.v. was correctly denied.[26] (The defendants' related motions for a new trial and remittitur raised no serious question and were also correctly denied.)

## CONSCIOUS PAIN AND SUFFERING

As noted above in the Narrative, Anmorian, when found on Saturday afternoon, May 16, was limp, unresponding, unseeing with eyes open, only emitting a "tiny" sound of breathing. She was brought to the emergency room at Massachusetts General Hospital, and triage examination occurred at 3:30 P.M. Sometime later the same day Dr. Alessandra Peccei, a resident in gynecology, with a nurse's help undressed the girl and prepared the rape kit. Dr. Peccei testified to abrasions of the girl's face and body and to the bodily evidence of penetration or attempted penetration. Dr. Peccei said they could not make her follow with her eyes or engage her in any sense; she was semiconscious, sleeping, or somnolent. When they moved a limb, she appeared in reaction to rouse herself and moan or cry. When still, there was no indication of pain. On the following day, she exhibited what evidently were signs of "decorticate posturing," defined as persistent flexion of the arm and extension of the leg on the other side, in other words, spasmodic movement of the arms and legs. This posturing reflects damage to the outer layer of

---

[26]In ruling on the motion, "we examine the case anew," *MacCormack* v. *Boston Edison Co.*, 423 Mass. 652, 659 (1996), and "consider whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn' in favor of the non-moving party." *Kattar* v. *Demoulas*, 433 Mass. 1, 8 n.5 (2000).

the spinal cord usually caused by oxygen deficiency.[27] Dr. Peccei thought the moaning and crying and grinding of teeth should not be considered part of the posturing, but she didn't know.

After CT scanning, Anmorian entered Ellison 3, the pediatric intensive care unit. Dr. Elizabeth Ann Catlin, then in charge of the unit, testified there was progressive neurologic impairment. On Sunday, the girl suffered a seizure. She required anticonvulsive medication and a breathing tube to the throat; finally, on Sunday night, she was put on a ventilator. She suffered brain death at 11:00 A.M. Monday, and life support was removed the following day. What brought her to her death, according to Dr. Catlin, was the lessening flow of oxygen or blood to the brain — all stemming from strangulation in the criminal episode. Dr. Catlin spoke of consciousness as an imprecise term and of neurologic awareness as a rough approximation of consciousness.[28]

In an effort to show awareness on the girl's part, counsel for the plaintiff asked the jury to look at places in the medical record (received in evidence in its entirety) that refer to particulars of the girl's condition. In our view, these items go no further than to bear out the doctors' testimony about the spasmodic moaning and crying and posturing.[29] To avail the plaintiff, the conscious suffering of G. L. c. 229, § 6, must be demonstrated by cognizable proof beyond mere surmise. See *Baldassare* v. *Crown Furniture Co.*, 349 Mass. 183, 195 (1965). Here the proof of awareness is null or, on any basis of comparison, not any more demonstrative than that appearing in decisions dismissing claims under § 6, e.g., *Carr* v. *Arthur D. Little, Inc.*, 348 Mass. 469, 474-478 (1965). There is no sign here of actual expression by the victim (or response) that supported positive findings in some other cases. See *Boutlier* v. *Malden*, 226 Mass.

[27]See Stedman's Medical Dictionary 446 (26th ed. 1995), defining "cerebral decortication"; Am. Jur. Proof of Facts 3d, Attorney's Illustrated Medical Dictionary P64 (2002), "decorticate posture."

[28]The statutory term "conscious" is not to be taken with the refinements one expects to find in a study of the elusive subject of consciousness.

[29]Where the record mentions movement of the arms or legs this is plainly referable not to free exercise but to the posturing. Moans, groans, and other sounds have generally been found insufficient to figure as evidence of consciousness. See *Ghiz* v. *Wantman*, 337 Mass. 415, 419 (1958); *Fialkow* v. *DeVoe Motors, Inc.*, 359 Mass. 569, 573-574 (1971).

479, 488 (1917); *Battany* v. *Wall*, 232 Mass. 138, 140-141 (1919); *Allison* v. *Sessa*, 302 Mass. 302, 303-304 (1939); *Campbell* v. *Leach*, 352 Mass. 367, 373 (1967). Upon a reading of the medical record we agree with the trial judge that the girl lacked consciousness or awareness from beginning to end. If the record could conceivably be read otherwise under expert guidance, the plaintiff offered no expert testimony (the doctors testified as observers not experts).[30]

Counsel suggests there may have been conscious suffering in the period before the child was found in apartment 3A. Suffice to say the suggestion fails as unsupported surmise.

We hold judgment n.o.v. was properly allowed as to conscious pain and suffering under § 6.

*Amended judgment affirmed.*

*Order denying motion for new trial affirmed.*

---

[30]The court in *Carr* v. *Arthur D. Little, Inc.*, 348 Mass. at 477, recognizes, besides the categories of cases where consciousness is proved or fails of proof, a third category, enigmatic for nonexpert observers, where expert opinion may be helpful or decisive. The trial judge herein in her memorandum of decision mentioned "the lack of interpretive medical testimony."